UNITED STATES of America,
Plaintiff-Appellee,

v.

Felipe MOLINA–URIBE,
Defendant-Appellant.

No. 87–2510.

United States Court of Appeals,
Fifth Circuit.

Aug. 24, 1988.

Joseph A. Connors, III, McAllen, Tex. (Court-appointed), J.M. Ramirez, Edinburg, Tex. (Court-appointed), Robert F. Campbell, McAllen, Tex., for defendant-appellant.

Henry K. Oncken, U.S. Atty., Paula Offenhauser, Frances H. Stacy, James R. Gough, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before POLITZ and JOHNSON, Circuit Judges, and BOYLE,* District Judge.

EDWARD J. BOYLE, Sr., District Judge:

The appeal herein comes before us in a case which arises out of the killing of a DEA Agent by a drug trafficker in the

* Senior District Judge of the Eastern District of Louisiana, sitting by designation.

course of an undercover drug deal. The evidence concerning the events which culminated in the death of Agent William Ramos (Ramos) is essentially uncontroverted.

Sometime before 3:00 p.m. on December 31, 1986, in McAllen, Texas, Felipe Molina-Uribe (Molina) and his co-defendant, Jesus Garcia Nieto (Garcia), were looking for a buyer for over 300 pounds of marijuana when they met the other co-defendant, Benito Cavazos-Lamas (Cavazos), in McAllen. Asked if he knew of a possible buyer, Cavazos indicated he did and, without knowing that Roberto "Raul" Ortiz (Ortiz) was a paid undercover DEA informant, arranged a meeting of Molina and Garcia with Ortiz, who was accompanied to the meeting by Ernesto Rodriguez-Ramirez (Rodriguez) another paid undercover DEA informer.

Ortiz, at various times between the first contact by Cavazos and completion of the sale arrangements, was in communication with the DEA agents to obtain instructions as the negotiations progressed. Finally, after several phone conversations between Ortiz and Molina and meetings in four different locations, it was arranged that DEA Special Agent Ramos, working undercover, but represented to Molina and Garcia as being a Cuban from New York, would be the buyer of the marijuana and a quantity of pills described as ionamines and pasadrenes, which Molina and Garcia were also offering for sale. Delivery and payment were to be made at 7:00 p.m. in the parking lot of Junior's Supermarket in Las Milpas, Texas.

Ramos, Ortiz and Rodriguez arrived at the parking lot in an undercover vehicle shortly after 7:00 p.m. When Molina arrived about 7:20 p.m. in a van loaded with large plastic bags containing the marijuana, Ortiz and Rodriguez went to Molina's van to inspect the marijuana following which they and Molina walked to the undercover vehicle where Ramos was waiting in the driver's seat.[1] Molina entered the rear seat of the car. The plan was that Ramos and Molina would swap vehicles and later re-exchange them after Molina removed the money from Ramos' car and Ramos the marijuana from Molina's van.

After a brief conversation about the money, Ortiz and Rodriguez walked to the rear of the Ramos car ostensibly to get the money from the trunk for Molina's inspection. By pre-arrangement, the lifting of the trunk lid was the signal for a number of surveilling DEA agents to converge on Ramos' vehicle. As the lid was opened, Ortiz observed through the car's rear window that Ramos had turned in his seat, drawn his revolver and pointed it at Molina, whereupon Molina grabbed Ramos and the revolver and attempted to wrest it from Ramos. With the car shaking from the struggle going on within and Ramos calling for help, Ortiz and Rodriguez went forward to assist Ramos who was then partly in the rear seat with Molina.

Ortiz entered the car to help Ramos while yelling they were Federal Drug Agents, ordering Molina to release the gun and admonishing him that he could get into serious problems if he did not. Rodriguez remained outside on the right side of the car, leaned into the car and began pulling on Molina's boots. About then, a shot occurred. Ortiz then repeated his order to Molina to let go of the gun and told him Ramos was a Federal Agent at which time Ramos said "I already told him that he is arrested and he does not want to pay attention." The shot struck Rodriguez in the hand and he quickly retreated in pain.[2]

---

**1.** The car was a Government vehicle assigned to DEA Special Agent Alvarez. The revolver which Ramos used and with which he was shot by Molina was issued to Alvarez. It was a second gun that Alvarez kept on the door side of the driver's seat of his car which he made available to Ramos with the car. Four rounds were found to have been fired from that revolver. Ramos also had with him a revolver issued to him which was found in the car after the killing and which had not been fired.

**2.** Rodriguez was unable to testify concerning Ortiz's statements to Molina and Ramos' statement to Molina, as testified by Ortiz, because, he testified, he wouldn't be able to say, he didn't hear anything (6R–569), the statements might have been made, but he was only paying attention to what he was doing at the time (6R–577), apparently a reference to the fact that while he was outside the car leaning through the open door, he grabbed Molina's feet, saw the gun and tried to grab it, but was struck in the hand by

As the struggle for the gun continued, second and third shots were fired. Again Ortiz admonished Molina to release the gun and told him they were Federal Agents, in response to which Ortiz said Molina made a statement in Spanish, the translation of which for the jury by Ortiz indicated that Molina thought Ramos and Ortiz were about to steal the marijuana and hurt him.

Finally, with Molina in possession of the gun and while Ramos had a hand on Molina's wrist trying to push the gun hand to the side, Molina forced the gun downward toward Ramos' chest, and fired the fourth shot into Ramos' chest fatally wounding him. (Ortiz Testimony—4R–236–294, 7R–692–707; Rodriguez Testimony—6R–560–588.)

DEA Agents Watkins and Alvarez arrived at Ramos' car almost immediately following the final shot. Watkins entered the car, put his revolver to Molina's head and Alvarez removed Ramos' gun from Molina's left hand. Molina was taken into custody and Ramos to the hospital in McAllen where he expired at 7:35 p.m.

Molina, Cavazos and Garcia were jointly charged in Counts One and Two of a superceding indictment returned on February 21, 1987. Count One, laid under 21 U.S.C. § 846, alleged the co-defendants conspired to possess with intent to distribute in excess of 100 kilograms of marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1). In Count Two, the three were charged with the substantive offense.

Count Three, brought under 18 U.S.C. §§ 1111 and 1114, charged that Molina, having been placed under arrest by Ramos and while attempting to escape, murdered Ramos while in the performance of his official duties by shooting him with the agent's Smith and Wesson revolver. Count Four alleges that during and in relation to the crime of violence described in Count

Three, Molina used the firearm described in that count in violation of 18 U.S.C. § 924(c).

On April 13, 1987, Molina pled guilty to Counts One and Two, but proceeded to trial on Counts Three and Four on which the jury returned verdicts of guilty on April 16, 1987.[3]

On May 13, 1987, the Court imposed the following sentences: on each of Counts One and Two, a prison term of 25 years, a four year term of supervised release and a $50.00 special assessment; on Count Three, imprisonment for life [4] and a $50.00 special assessment; on Count Four, a five year prison term and a $50.00 special assessment. The Court ordered that the 25 year sentences run consecutively and the life sentence concurrently with those sentences. The five year sentence on Count Four will run consecutively to the other prison sentences under the provisions of 18 U.S.C. § 924(c)(1).

Only Molina's appeal is before us. We will discuss his claims of error under the rubric of the particular counts to which they relate.

### COUNT ONE

At his re-arraignment on Count One, the trial judge's Rule 11(c)(1) advice to Molina with respect to the applicable penalty was:

> [Y]ou can be confined in the penitentiary for a period of five years without parole or probation, not less than five years without parole or probation, all the way up to 40 years, or you can be fined $2 million, or both; that is to say you can be fined $2 million and be confined for a maximum period of 40 years, five of which you would have to serve without probation or parole and there would have to be imposed against you an assessment of $50.00. 4R–206–207.

Molina contends his conviction on Count One should be reversed because the trial

---

the first shot (6R–567) which caused him to give up his efforts and to move away in pain (6R–565, 567, 576–77; 7R–700).

**3.** Cavazos pled guilty on Count One and Count Two as to him was dismissed. He testified as a Government witness at trial.

**4.** The Government did not seek the death penalty. (3R–10)

judge, in the plea proceedings, erroneously informed him that he was subject to a mandatory minimum five year term of imprisonment and was ineligible for probation and parole. He supports this contention with the assertion that 21 U.S.C. § 846 does not authorize such a minimum prison term or prohibit probation or parole (Br. 34–35).

Then, in another and somewhat incongruent assignment of error, Molina complains that the Court failed to inform him of "the mandatory supervised release term of at least four years and up to life" and erred in failing to determine as to such term that "appellant understood the mandatory minimum penalty and the maximum possible penalty provided by law, including any 'special parole term.' " The "mandatory minimum penalty" referred to is presumably the five year mandatory minimum prison term of which he contends, as noted above, the Judge erroneously advised him (Br. 38–42). Why he would have the Court inform him with regard to a "special parole term" when he points out, correctly so, that *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), held special parole terms were not applicable under § 846 [5] is not clear.

In another assignment of error he attacks the imposition of the four year term of supervised release on Count One, contending that the rationale of *Bifulco* should be applied to exclude application of the supervised release term in § 846 convictions (Br. 35–38).

Finally, he urges that his plea of guilty was not intelligently, voluntarily and understandingly made because the trial judge failed to explain the mandatory four year supervised release term which is a penal consequence of his plea (Br. 35–38).

21 U.S.C. § 846 denounces attempts and conspiracies to commit drug offenses and provides they are "... punishable by imprisonment or fine or both which may not exceed the maximum prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

As pertinent to our consideration, 21 U.S.C. § 841(b)(1)(B)(vii) provides a mandatory minimum five year prison term and a maximum 40 year prison term, a fine or both for the § 841(a)(1) substantive offense which was the object of the conspiracy. Suspended sentences and probation are prohibited and accuseds are declared ineligible for parole during the term of imprisonment imposed. Additionally, the statute requires the imposition of a term of supervised release of at least four years.

Drug violation laws [6] in effect at the time of passage of the Anti-Drug Abuse Act of 1986 authorized imposition of "special parole terms" in connection with prison sentences for some substantive drug offenses including those defined in § 841(a)(1). The 1986 Act substituted "term of supervised release" for "term of special parole" in § 841(b), effective November 1, 1986.[7] That original effective date of the substitution was extended to November 1, 1987, but for substantive offenses committed prior to November 1, 1987, terms of special parole remained authorized. *See United States v. De Los Reyes*, 842 F.2d 755 (5th Cir.1988); *United States v. Byrd*, 837 F.2d 179 (5th Cir.1988); *United States v. Fernandez-Dilone*, 668 F.Supp. 245, 248 (S.D.N.Y.1987). However, the Supreme Court in *Bifulco, supra*, as noted above, has declared special parole terms inapplicable under § 846. The *Bifulco* rationale, it seems, should also preclude terms of supervised release from being carried over to § 846. We agree with Judge Johnson of the Eleventh Circuit that the post-incarceration monitoring device referred to as "special parole" and that referred to as "supervised release" present

---

**5.** *See* Br. at 35–38.

**6.** See Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, § 401(b), 1970 U.S.Code Cong. & Admin.News (84 Stat. 1236), 1437, 1467–68 and amendments thereto prior to Pub.L. 99–570.

**7.** Pub.L. 99–570, §§ 1002, 1004(a), 1005(a)(2), 1986 U.S.Code Cong. & Admin.News (100 Stat.) 3207–2–3207–4; 3207–6; 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), (b)(1)(C), (b)(1)(D) and (b)(2).

only a distinction without a difference.[8] *See United States v. Smith*, 840 F.2d 886, 890 n. 3 (11th Cir.1988). Even if supervised release terms were held to be included in § 846, and we find it unnecessary to decide whether they do or do not, they could not be applied to offenses committed before November 1, 1987. Molina's offense occurred on December 31, 1986. Therefore, the term of supervised release has been illegally imposed in connection with the prison sentence on Count One and must be vacated. Failure to inform appellant of an inapplicable supervised release or special parole term cannot result in error or make his plea any the less voluntary.

■ And, obviously, it would not be error to inform appellant of his ineligibility for traditional parole if that ineligibility were to be considered, arguendo, included in the penalty provisions of § 846. Indeed, the trial judge in that instance would not be required to inform the accused concerning parole ineligibility. *United States v. Garcia*, 636 F.2d 122, 123 (5th Cir.1981); *Herrera v. United States*, 507 F.2d 143, 144 (5th Cir.1975); *United States v. Sapp*, 439 F.2d 817, 820 (5th Cir.1971); *Trujillo v. United States*, 377 F.2d 266, 269 (5th Cir. 1967).[9] *See also Hill v. Lockhart*, 731 F.2d 568, 570 (8th Cir.1984), *aff'd*, 764 F.2d 1279 (1984) (*en banc*), *aff'd*, 474 U.S. 52, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985). On the other hand, if parole were considered available under § 846, being advised that it was not would not vitiate Molina's plea. Such misinformation would only indicate harsher punishment and could not have induced his plea. *Johnson v. United States*, 542 F.2d 941, 942 (5th Cir.1976); *United States v. Sapp, supra. See also* Fed.R.Crim.P. 11(c) advisory committee's notes, 1974 amendment, *citing United States v. Garcia, supra*, and advisory committee's notes, 1982 amendment. On the contrary, being told he was ineligible for parole might reasonably have been expected to dissuade him from pleading guilty. The same reasoning would apply equally to Molina's claim that he was misinformed concerning ineligibility for probation, which Judge Goldberg in *Sanchez v. United States*, 417 F.2d 494, 496–97 (5th Cir.1969) found to be not meaningfully different from ineligibility for parole for purposes of Rule 11.

■ Molina's further claim that Judge Vela committed reversible error in the plea proceedings is based on the assertion that a mandatory minimum five year prison term is also not provided for by § 846 and therefore he was misinformed by the Judge that he was subject to being sentenced to such a term of imprisonment. In order to dispose of this contention, which we do adversely to Molina, it matters naught, and we need not determine, whether the mandatory minimum prison sentence set out in § 841(b)(1)(B)(vii) is or is not carried over by § 846.

Judge Vela correctly made Molina aware that he could be sentenced to prison for the maximum period of forty years, which maximum unquestionably applies to § 846 offenses. A twenty-five year sentence was imposed. If the mandatory minimum sentence provision was not applicable to Molina's Count One offense, he was not misled or prejudiced by advice that it was. He certainly understood that he could be given the maximum forty year sentence; and if he were given the maximum sentence, or any lesser term in excess of five years, the fact that § 846 would not include the mandatory minimum would be of no significance.

Any misstatement by the Court regarding the application of the mandatory minimum sentence in its Rule 11 colloquy would only be harmless error. As a general proposition, the harmless error doctrine

---

**8.** The function of supervising persons on parole is retained by the Parole Commission (*see* 18 U.S.C. § 4203) until November 1, 1992 when that function will be transferred to the Courts, which will also have jurisdiction of persons on supervised release. *See* 18 U.S.C. § 3583, Pub.L. 98–473, § 218(a)(5), 1984 U.S.Code Cong. & Ad-min.News (98 Stat.) 2027 (repealing parole release provisions); *id.* § 235(b)(1)-(5), 98 Stat. 2032–2033 (continuing those provisions in effect for five years from November 1, 1987).

**9.** Both *Herrera* and *Trujillo* involved statutorily prohibited traditional parole for drug offenses.

of Rule 11(h) applies where the "nature and extent of the deviation from Rule 11 was such that it could not have had any impact on the defendant's decision to plead or the fairness in ... holding him to his plea." Fed.R.Crim.P. 11(b) advisory committee's notes, 1983 amendment; *see Coody v. United States*, 588 F.2d 1089, 1090 (5th Cir.1979) (failure to comply with Rule 11 not fatal if it was not "likely to have been a material factor affecting the petitioner's decision to plead guilty", *quoting Keel v. United States*, 585 F.2d 110, 116 (5th Cir. 1978) (*en banc*) (Rubin, J. concurring)).

The very advice that he faced at least five years in prison could well have had a significant influence on Molina's decision to plead guilty. It appears he was a first offender. That fact and his knowledge that he would face overwhelming evidence of guilt in a trial (as the trial evidence discloses) may well have motivated him to plead guilty in the hope of receiving consideration for having admitted his guilt and of being given the more lenient minimum prison term rather than a greater sentence.

No representations of benefits from pleading guilty were made to Molina. On the contrary, what he heard were only detriments of a plea. Under the facts here, any misinformation imparted by the trial judge in the Rule 11 colloquy could not have induced the plea nor did it render it involuntary. Any errors in the Court's Rule 11 advice to Molina we find were, at worst, harmless under Rule 11(h). The conviction on Count One will be affirmed, but the case will be remanded for deletion from the sentence imposed the term of supervised release. *Cf. United States v. Bland*, 653 F.2d 989, 997 (5th Cir.1981) (case remanded with instructions to strike illegally imposed special parole term from sentence).

## COUNT TWO

■ At his rearraignment on Count Two, Judge Vela informed Molina:

> [Y]ou can be confined in the penitentiary for not more than 40 years, five of which

you would have to serve without parole or probation or you could be fined $2 million and you could be confined for a period of 40 years, five years of which would have to be imposed against you without probation or parole, and there would have to be imposed against you an assessment of $50.00. 4R–207–208.

Molina now claims that his plea should be set aside and he be allowed the opportunity to plead anew because the failure of the Court "to explain the mandatory supervised release term of at least four years which are penal consequences of the plea" (Br. at 42) and the failure of the Court to "determine that as to the mandatory supervised release term of at least four years and up to life, that appellant understood the mandatory minimum penalty and the maximum possible penalty provided by law, including any 'special parole term' " (Br. at 38) caused his plea not to be intelligently, voluntarily and understandingly entered.

As previously noted, Count Two charged that a substantive § 841(a)(1) offense occurred on December 31, 1986 to which the penalties prescribed by § 841(b)(1)(B)(vii) apply.

In our earlier discussion herein relating to Count One, we pointed out that terms of supervised parole were not applicable to offenses occurring prior to November 1, 1987,[10] but terms of special parole remained applicable and mandatory with respect to sentences imposed under § 841(b)(1)(B)(vii) for such offenses. *Byrd, De Los Reyes* and *Fernandez-Dilone, supra*.

Federal Rule of Criminal Procedure 11(c)(1) requires the district judge, before accepting a guilty plea, to advise the defendant of and to determine that he understands "... the maximum possible penalty provided by law, *including the effect of any special parole term...*." (emphasis added).

The statute requiring imposition of a special parole term fixes a mandatory minimum term, but sets no maximum limit for

---

**10.** The imposition of the supervised release term in connection with the term of imprisonment to which Molina was sentenced on Count Two was also illegal.

the term. A number of circuits have held that a special parole term may extend for life. *See United States v. Sharon,* 812 F.2d 1233, 1234 (9th Cir.1987); *United States v. Bridges,* 760 F.2d 151, 153 (7th Cir.1985) and cases cited therein.

Rule 11(c)(1) compels the Court to inform the defendant not only of the mandatory minimum, but of the possible maximum post-incarceration period during which the special parole will be effective along with an explanation of how it would operate (*see Moore v. United States,* 592 F.2d 753, 755 (4th Cir.1979), decided before the language "including the effect of any special parole term" was added to Rule 11(c)(1)) and to be itself convinced that the defendant understands the Court's advice and explanations. Because the trial judge, as to Count Two, did not so inform Molina,[11] Molina's substantive rights were affected and his plea of guilty on that count must be set aside and he be allowed an opportunity to plead anew. *United States v. Sharon, supra.*

## COUNT THREE

### 1. Heat of Passion

Molina's defense to the charge in Count Three, as declared in opening statement, was that it was not he who shot Ramos, but rather that Ramos was the victim of a conspiracy and assassination by fellow DEA agents.[12] There was not a scintilla of evidence to support that theory.

In closing argument, defense counsel Ramirez urged only the conspiracy-assassination defense and made no mention of acci-

dental or heat of passion killing or self-defense.[13] In his argument,[14] co-counsel Connors very briefly argued accidental killing (8R–882) and self-defense (8R–886–887) and posited that if Ortiz is believed, "... this shooting occurred during a quarrel, during sudden passion ..." and the best the jury could give the Government would be a verdict of manslaughter (8R–881–882). But in his concluding remarks, which contained his only other reference to heat of passion, he declared that even a manslaughter verdict would not be proper and asked for a not guilty verdict for his client (8R–889).

Molina's arguments for reversal of his conviction on Count Three are: the absence of sudden quarrel and heat of passion upon sudden provocation is an essential element of the offense of murder (first and second degree) which the Government is required to prove beyond a reasonable doubt;[15] the Court did not instruct the jury to that effect in accordance with the proposed instruction[16] submitted by him or one similar thereto; he was denied due process as a result of the Court's failure to instruct the jury on his heat of passion and intoxication theories of defense; and, finally, the evidence was insufficient for the jury to find there was an absence of heat of passion necessary to be found for a murder conviction.[17]

For support of his position that the Government bore the burden of proving he was *not* acting "under the immediate influence of sudden passion arising from an adequate cause ...," (*see* note 16, *supra*)

---

**11.** Although, as previously noted, the trial judge imposed a supervised release term, he did not advise Molina of its effect before accepting the guilty plea.

**12.** 5R–406, 409–10; *see also* 5R–386.

**13.** 8R–889–905.

**14.** 8R–880–889.

**15.** At the conclusion of the jury charge, counsel for Molina objected that the absence of heat of passion was an element of the crime of murder which must be proved by the Government and about which the Court had failed to instruct the jury. (*See* 8R–250; Br. at 9–22).

**16.** The submitted instruction denied by the trial judge reads:

"Now, if you find from the evidence beyond a reasonable doubt that on or about the 31st day of December, 1986, in Hidalgo County, Texas, the defendant, Felipe Molina-Uribe, did intentionally or knowingly cause the death of an individual, namely, William Ramos, by shooting him with a gun, and that the defendant, in so acting, was not acting under the immediate influence of sudden passion arising from an adequate cause, then you will find defendant guilty of murder, as charged in the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of murder."

**17.** *See* note 26 *infra.*

and the requirement for jury instructions with respect thereto, Molina relies on *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) and *United States v. Lofton*, 776 F.2d 918 (10th Cir. 1985). This reliance is misplaced.

■ As a preliminary matter, the failure of a trial court to give a requested instruction is reviewed under an abuse of discretion standard, and constitutes such abuse only when: (1) the requested instruction is substantially correct, (2) is not substantially covered in the Court's actual charge and (3) is important to a point in the trial so that the failure to give the instruction impairs the defendant's ability to present a given defense effectively. *United States v. Hunt,* 794 F.2d 1095, 1097 (5th Cir.1986). Without reaching the second or third factors, we hold that the requested instruction is not a substantially correct statement of the law.

*Mullaney* involved a constitutional challenge to a Maine statutory scheme providing that murder and manslaughter were different degrees of the single generic offense of felonious homicide. Under this scheme, if the prosecution established that the homicide was both intentional and unlawful, malice aforethought, an essential and indispensable element of the crime of murder, was to be conclusively implied unless the defendant proved by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation. *Mullaney,* 421 U.S. at 686, 95 S.Ct. at 1883. If the defendant met this burden, the lesser penalty prescribed for manslaughter would be imposed. Moreover, the Maine Supreme Court had held that malice aforethought did not connote "a substantive fact" like premeditation, but rather embodied only a policy presumption; that is, the prosecution was required to prove the same element of intent for both murder and manslaughter, with the distinction that in the case of manslaughter "the intent results from a sudden provocation which leads the defendant to act in the heat of passion." *Mullaney,* 421 U.S. at 689 n. 9, 95 S.Ct. at 1885 n. 9. Thus, the issue before the Court was "whether the Maine rule requiring the de-

fendant to prove that he acted in the heat of passion on sudden provocation accords with due process." *Mullaney,* 421 U.S. at 692, 95 S.Ct. at 1886.

The Court began its analysis with a historical review of malice aforethought from which the Court concluded:

> First, the fact at issue here—the presence or absence of the heat of passion on sudden provocation—has been, almost from the inception of the common law of homicide, the single most important factor in determining the degree of culpability attaching to an unlawful homicide. And, second, the clear trend has been toward requiring the prosecution to bear the ultimate burden of proving this fact. *Mullaney,* 421 U.S. at 696, 95 S.Ct. at 1888 (citations omitted).

The Court proceeded to reject the argument of the state of Maine that due process interests were not implicated inasmuch as the absence of heat of passion was not a fact necessary to constitute the crime of felonious homicide, and hence of criminality in the first instance, but rather came into play at the punishment phase of the proceedings:

> Maine has chosen to distinguish those who kill in the heat of passion from those who kill in the absence of this factor. Because the former are less "blameworth[y]," ... they are subject to substantially less severe penalties. By drawing this distinction, while refusing to require the prosecution to establish the fact upon which it turns, Maine denegrates the [due process] interests found critical in [*In re*] *Winship* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)]. *Mullaney,* 421 U.S. at 698, 95 S.Ct. at 1889 (citation omitted).

Moreover, reasoned the Court, due process interests received minimum protection under the Maine scheme because it "affirmatively shifted the burden of proof to the defendant. The result, in a case such as this one where the defendant is required to prove the critical fact in dispute, is to increase further the likelihood of an erroneous murder conviction." *Id.,* 421 U.S. at 701, 95 S.Ct. at 1890.

The Court also denied that requiring the prosecution to prove a negative, i.e., that the defendant acted in the absence of the heat of passion, imposed an unduly difficult burden. *Id.*, 421 U.S. at 701–02, 95 S.Ct. at 1891. The Court then held that "the due process clause requires the prosecution to prove beyond any reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Id.*, 421 U.S. at 704, 95 S.Ct. at 1892.

The Ninth and Tenth Circuits have extended the application of *Mullaney* beyond the context of burden-shifting statutory schemes. In *United States v. Lofton, supra,* the Tenth Circuit reversed a conviction for second degree murder under 18 U.S.C. § 1111 where the evidence raised a heat of passion issue but where the trial court declined to give a jury instruction specifying that the Government bore the burden of proving beyond a reasonable doubt that the defendant acted without heat of passion. The Tenth Circuit reasoned:

> To obtain a conviction for murder, the Government must establish beyond a reasonable doubt that the defendant acted with malice. *See* 18 U.S.C.A. § 1111(a). A voluntary manslaughter conviction requires proof beyond a reasonable doubt that the defendant acted without malice and "[u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). The distinction between malice and heat of passion led the Supreme Court to hold that, to obtain a murder conviction, the prosecution must "prove beyond a reasonable doubt the *absence* of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Mullaney v. Wilbur*, 421 U.S. 684, 697–98, 704, 98 S.Ct. 1881, 1888–89, 1892, [44] L.Ed.2d 508 (1975) (emphasis added). Failure to impose this requirement exempts the Government from the obligation under the due process clause to prove the defendant guilty of murder beyond a reasonable doubt. *Lofton,* 776 F.2d at 920.

The Court went on to conclude that as malice is an element of the federal murder statute, and as the heat of passion defense negates malice, *Mullaney* applied to the appeal before the panel. The panel expressly ruled that the "heat of passion" component of the manslaughter charge given by the trial court in *Lofton* did not suffice either to apprise the jury of the Government's "negative" burden under *Mullaney* with respect to the murder count or to inform the jury of the defendant's theory of the case. *Id.* at 920–22.

In *United States v. Lesina,* 833 F.2d 156 (9th Cir.1987), the Ninth Circuit struck down a conviction for second degree murder under the same federal statute and for the same reasons relied on by the Tenth Circuit in *Lofton:* "We construe *Mullaney* to require jury instructions for murder to state that the Government bears the burden of proving beyond a reasonable doubt the absence of heat of passion or sudden quarrel where that defense is raised." *Lesina,* 833 F.2d at 160.

It should thus be noted that it is difficult to imagine closer factual and legal analogies to the instant case than those posed by *Lofton* and *Lesina.* Nevertheless, other decisions of the Supreme Court and of this circuit require a more restrictive reading of *Mullaney* and compel us to part company with the Ninth and Tenth Circuits.

In *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), the Court affirmed a conviction for second degree murder under a New York statute which imposed upon a defendant the burden of proving by a preponderance of the evidence the affirmative defense of extreme emotional disturbance to reduce the crime of murder to manslaughter. The Court noted that "this defense is a considerably expanded version of the common law defense of heat of passion on sudden provocation" and that at common law the burden of proving any such affirmative defense was upon the defendant. *Id.*, 432 U.S. at 202, 97 S.Ct. at 2323.

> The crime of murder is defined by statute, which represents a recent revision of the state criminal code, as causing the death of another person with intent to do so. The death, the intent to kill, and

causation are the facts that the state is required to prove beyond a reasonable doubt if a person is to be convicted of murder. *No further facts are either presumed or inferred in order to constitute the crime.* [The affirmative defense of extreme emotional disturbance] if proved by a preponderance of the evidence, would reduce the crime to manslaughter. *Id.* 432 U.S. at 205–06, 97 S.Ct. at 2324–25 (emphasis added).

The Court also observed that the affirmative defense "does not serve to negative any facts of the crime which the State is to prove in order to convict of murder." *Id.*

In ruling that the New York law passed constitutional muster, the Court carefully reconsidered the *ratio* and holding of *Mullaney.* The Court hammered upon the peculiar feature of the Maine homicide law as dispositive in *Mullaney:*

> Malice, as the statute indicated and as the Court instructed, could be implied and was to be implied from "any deliberate, cruel act committed by one person against another suddenly ... or without a considerable provocation," in which event an intentional killing was murder unless by a preponderance of the evidence it was shown that the act was committed "in the heat of passion, on sudden provocation." The instructions emphasized that " 'malice aforethought and heat of passion on sudden provocation are two inconsistent things'; thus by proving the latter the defendant would negate the former." *Id.,* 432 U.S. at 213, 97 S.Ct. at 2328, *quoting Mullaney,* 421 U.S. at 686–87, 95 S.Ct. at 1883.

The Court specified that *Mullaney* turned upon the fact that in Maine, the absence of heat of passion was expressly part of the definition of malice, an element of the crime, and that this element was presumed by law: "By legal definition under Maine law, a killing becomes unlawful and punishable as 'murder' on proof of 'any deliberate, cruel act, committed by one person against another, suddenly, *without any, or without a considerable provocation.*' " *Patterson,* 432 U.S. at 214, 97 S.Ct. at 2329, *quoting State v. Lafferty,*

309 A.2d 647, 664–65 (Me.1973) (emphasis added by the Court). The Court similarly observed:

> [M]alice, *in the sense of the absence of provocation,* was part of the definition of the crime. Yet malice, i.e., lack of provocation, was presumed and could be rebutted by the defendant only by proving by a preponderance of the evidence that he acted with heat of passion upon sudden provocation. *Patterson,* 432 U.S. at 216, 97 S.Ct. at 2330 (emphasis added).

Thus, while in *Patterson* it was argued "that the state may not permit the blameworthiness of an act or the severity of punishment authorized for its commission to depend on the presence or the absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt," yet in the Court's view "the *Mullaney* holding should not be so broadly read." *Id.,* 432 U.S. at 214–15, 97 S.Ct. at 2329.

Accordingly, the Court restated the holding of *Mullaney,* properly understood:

> *Mullaney* surely held that a state must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense.... Such shifting of the burden of persuasion with respect to a fact which the state deems so important that it must be either proved or presumed is impermissible under the Due Process Clause.
>
> *It was unnecessary to go further in Mullaney. Patterson,* 432 U.S. at 215, 97 S.Ct. at 2329 (emphasis added).

We construe this declaration to indicate that *Mullaney's* other pronouncements should be regarded as dicta.

That *Patterson* constricts the holding of *Mullaney* was also vigorously noted by Justice Powell, *Mullaney's* author, who dissented in *Patterson:*

> The test the Court today establishes allows a legislature to shift, virtually at will, the burden of persuasion with respect to any factor in a criminal case, *so*

*long as it is careful not to mention the nonexistence of that factor in the statutory language that defines the crime.* The sole requirement is that any references to the factor be confined to those sections that provide for an affirmative defense. *Id.,* 432 U.S. at 223, 97 S.Ct. at 2333 (Powell, J. dissenting) (emphasis added).

*Cf. Woods v. Butler,* 847 F.2d 1163 (5th Cir.1988). (Under *Patterson,* Louisiana statute imposing upon defendant the burden of proving that he had a prescription for controlled substance passed due process muster because Louisiana Supreme Court ruled that "absence of prescription" was not an element of the offense of possession of a controlled substance).

Additionally, in *Holloway v. McElroy,* 632 F.2d 605 (5th Cir.1980), *cert. denied* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981), as noted by the able trial judge herein, 1R–17 n. 3, this Court explicitly recognized that after *Patterson,*

> *Mullaney* can only be read as a case in which the Supreme Court did not believe that the State's procedures afforded adequate regard for the substantive value that prompted the procedural rule announced in [*In re*] *Winship* [*supra*]: once the *Mullaney* Court had determined that malice (lack of provocation) was an essential element of the crime of murder under Maine law, it was led to conclude that forcing the defendant to carry the burden of persuasion on that issue violated procedural due process, for it made all too likely a defendant's conviction when there was a reasonable doubt about the truth of an essential element of the crime. Thus, *Patterson* reads *Mullaney* as being no more than a procedural due process case that protects an established substantive value.[33]

---

[33] The *Mullaney* doctrine, as re-read by the *Patterson* Court, may represent the outer limits of the rational use of procedural due process to promote substantive justice. Our notions of substantive fairness have only limited correlation to the allocation of burdens of persuasion.... That part of *Mullaney* which survives *Patterson* [is] the rule that a State may not

place upon the defendant the burden of persuasion on an issue that, if established, would necessarily negate an element of the crime.... *Holloway,* 632 F.2d at 626 and n. 33.

Thus, *Lofton* and *Lesina* go too far in making the prosecution prove the absence of heat of passion even when the element of malice is neither presumed nor required to be disproved by the defendant.

Finally, in *Martin v. Ohio,* 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), the Court affirmed a conviction for aggravated murder under an Ohio statute which imposed the burden of proving by a preponderance of the evidence the affirmative defense of self-defense:

> The state did not exceed its authority in defining the crime of murder as purposely causing the death of another with prior calculation or design. It did not seek to shift to [the defendant] the burden of proving any of those elements, and the jury's verdict reflects that none of her self-defense evidence raised a reasonable doubt about the state's proof.... *Id.,* 480 U.S. 233, 107 S.Ct. at 1102.

The Court failed "to discuss or even cite *Mullaney.*" *Id.,* 480 U.S. 241, 107 S.Ct. at 1106 (Powell, J. dissenting).

■ It would therefore appear that the texts of *Mullaney* and of *Patterson* will only support two principles: (1) that an element of a crime may not be presumed, and (2) that a burden may not be imposed upon a criminal defendant to disprove an element of a crime, as that element is defined by statute or jurisprudence.

■ The charge[18] given the jury in the instant case does not run afoul of these principles and correctly set forth the law applicable in the case. First, the murder charge places no burden of any kind whatsoever upon the defendant. 8R–933–37. Second, "malice aforethought" is not defined, either by the charge or by the underlying statute, in terms of an absence of heat of passion. 8R–934; 18 U.S.C. § 1111. Third, the jury was expressly admonished that

> in determining whether William Ramos was unlawfully killed with premeditation

---

**18.** 8R–867–872, 923–949, 951–952.

and malice aforethought, the jury should consider all the facts and circumstances preceding, surrounding and following the killing as shown by the evidence in the case which tend to shed light upon the condition of the mind and heart of the accused before and at the time of the deed. No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the question of malice aforethought and premeditation should escape careful consideration by the jury. 8R–935. *Cf. Martin v. Ohio*, 480 U.S. at 233, 107 S.Ct. at 1102 ("It would be quite different if the jury had been instructed that self-defense evidence could not be considered in determining whether there was reasonable doubt about the state's case, *i.e.*, that self-defense evidence must be put aside for all purposes unless it satisfied the preponderance standard [imposed by statute for making out the affirmative defense].") Fourth, the manslaughter charge squarely placed upon the Government the burden of proving heat of passion beyond a reasonable doubt, nowhere placed any burden of any kind upon the defendant, and instructed the jury that a homicide committed in the heat of passion caused by adequate provocation is not murder, but manslaughter. 8R–939–94.

▌▌▌▌ Finally, appellant has not been deprived of a charge relating to his theory of the case of "heat of passion." In direct appeal cases, a defendant is entitled to have the jury instructed on requested defense theories that have a foundation in the evidence. Even in the context of direct appeal, it is not reversible error if the trial court fails to give an instruction that does not have a legally sufficient basis in the evidence. *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir.1986). Moreover, the refusal to adopt a defendant's proposed charge warrants reversal only where the charge, considered as a whole, does not accurately reflect the issues and the law of the case. *United States v. Schmitt*, 748 F.2d 249, 253 (5th Cir.1984), *quoting United States v. Fowler*, 735 F.2d 823, 829 (5th

Cir.1984). The charge given herein accurately reflects the law pertaining to murder and manslaughter, and the manslaughter charge expressly raises the issue of heat of passion for consideration by the jury.

### 2. Intoxication

Molina requested the following instruction on intoxication:

> Evidence has been introduced that the defendant was intoxicated at the time of the commission of the crime charged in the indictment. (Describe the requisite element of intent), as that term has been defined in these instructions, is an essential element of this murder crime. The evidence of intoxication may be sufficient to create a reasonable doubt as to whether the defendant was able to form the required intent to commit the crime charged. 1R–84.

The Government countered with a request that the jury be told intoxication is not a defense.[19] Finding that the evidence did not warrant either instruction, the trial judge denied both requests,[20] but informed defense counsel they may, if they chose to do so, touch upon intoxication as a state of mind in argument.[21] They did not.

Molina contends it was reversible error to deny the instruction and the Government responds that the charge was not warranted by the evidence. The Court's refusal of the instruction was correct.

▌▌▌▌ It is well settled that voluntary intoxication is no defense to a general intent crime. It is also the rule in this circuit that where specific intent is an element of the crime charged, e.g., premeditation in the case of first degree murder, evidence of intoxication is proper for consideration by the jury to determine whether a sufficient degree of intoxication existed to negate such intent. *United States v. Romano*, 482 F.2d 1183 (5th Cir.1973); *United States v. Caples*, 391 F.2d 1018 (5th Cir.1968). An accused is entitled to a jury instruction on such a theory of defense if the theory has a

**19.** 8R–834–835.

**20.** 8R–826–827, 835–836, 949.

**21.** 8R–835.

foundation in the evidence, *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir. 1986); *United States v. Williams*, 728 F.2d 1402, 1404 (11th Cir.1984), even though the evidence may be weak, insufficient, inconsistent or of doubtful credibility. *See United States v. Hammons*, 566 F.2d 1301, 1302 (5th Cir.1978). But no instruction is required where a theory of defense lacks evidentiary support. *United States v. Gentry*, 839 F.2d 1065, 1071 (5th Cir.1988); *United States v. Brooks*, 611 F.2d 614, 619 (5th Cir.1980); *United States v. Dobson*, 609 F.2d 840, 843 (5th Cir.1980). *See also* 8A J. Moore, Moore's Federal Practice ¶ 30.03(1) at 30–10 (2d Ed. 1987).

■ Our careful review of the evidence in the light most favorable to Molina, as is required by *United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir.1979), discloses there is simply no evidence to support a claim of intoxication of Molina to any degree by ethanol and/or marijuana. Indeed, on the contrary, the evidence is strong, amply sufficient, consistent, completely credible and clearly establishes that Molina was not intoxicated. In that circumstance, merely labelling a requested instruction a theory of defense does not warrant its being delivered to the jury. *United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir.1978), *modified on rehearing en banc*, 590 F.2d 1379, *cert. denied sub nom. Bertolotti v. United States*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 and 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979); *United States v. Silverman*, 745 F.2d 1386, 1399 (11th Cir. 1984).

Molina did not testify at trial; no one who did testified whether Molina drank any alcoholic beverage or was under its influence. The evidence does disclose Molina's minimal use of marijuana on the day in question. While Cavazos was visiting at Salomon's car lot in McAllen, where he was formerly employed, Molina and Garcia ar-

rived there. Upon meeting Cavazos, they talked, and during their conversation Molina and Garcia asked Cavazos for the first time whether he knew someone who would buy the marijuana they had for sale. Evidently, Molina and Garcia also were seeking to buy a car (later in the day Molina said he was having trouble with the Chevy van in which he and Garcia arrived at Salomon's lot (4R–252)), and with Cavazos accompanying them in the Chevy van drove to a car auction in Pharr, Texas, where Molina and Garcia looked for a car, but found none to their liking. Cavazos testified that during the drive to Pharr, Molina smoked a marijuana cigarette. All of these events occurred a considerable time before 3:00 p.m. when, after the three returned from Pharr to Cavazos' home (presumably in McAllen), Cavazos called Ortiz to tell him that he, Cavazos, had some persons who had marijuana to sell. (4R–224–229, 238).

Later in the day, which the sparse evidence relating to times of events indicates probably was a few minutes after 5:00 p.m., Ortiz and Rodriguez arrived at Junior's Supermarket in Las Milpas for a meeting to further negotiate with Molina and Garcia for the sale and purchase of the marijuana. Upon arrival, they approached in a Ford Bronco in which Molina occupied the passenger seat and Garcia the driver's seat. At the time, Molina, holding a paper grocery bag containing marijuana between his knees, was rolling a marijuana cigarette which he lit and began to smoke, but gave to Garcia when he proceeded to display the bagged marijuana and give samples thereof to Ortiz. What happened to the cigarette after that is not disclosed by the evidence.[22]

DEA Special Agents Alvarez and Saldana had sufficient opportunity to observe Molina's appearance, condition and actions following his arrest. Alvarez said that Mo-

---

**22.** We note that at another stage of the negotiations, Molina disclosed that he also had some pills called "ionamines and pasadrenes." On that occasion Molina said to Garcia "that with the pasadrenes he had hit his face," which provoked laughter by both of them. Evidently Molina made the comment to describe an experi-

ence on a prior occasion which he and Garcia found amusing. 4R–247. There is no other evidence in the record on that subject, nor is there any claim or evidence that Molina had used or was under the influence of the pills at the time under consideration.

lina was removed from Ramos' car, and while under arrest and in his charge, Molina was able to stand without support before the ambulance arrived to remove him to the hospital for treatment of the leg wound he sustained in the struggle over Ramos' gun, he responded to his, Alvarez's, statements in unslurred and undistorted speech, his eyes were not glazed, his breath did not have an alcohol odor and he was not intoxicated on either alcohol or marijuana or a combination thereof.[23]

Special Agent Saldana testified that he came to where Special Agent Alvarez had Molina in custody and while within a few feet of Molina, he observed Molina who, looking at him, volunteered to him in Spanish, and in unslurred and undistorted speech that he "didn't want to do that thing," referring to shooting Ramos and "that the gun had gone off by itself and ... he also had been injured in his own leg and that it was hurting him." [24]

Federal Bureau of Investigation Special Agent Campbell, who was a supervisory agent and expert examiner in the Chemistry-Toxicology Unit of the F.B.I. Headquarters' Laboratory, testified that the analysis of Molina's blood sample disclosed a very low level, .057 gram percent, of blood alcohol concentration. It was his opinion that one with such a low level of blood alcohol would not be considered under the influence of alcohol. Campbell, who was called by the defense, in response to a very general hypothetical question put by defense counsel, said a combination of ethanol and tetrahydrocannabinol (THC), the drug substance which produces the effects associated with marijuana, could have greater intoxicating effect than either substance alone. But, he pointed out, in order to have some opinion as to whether one was under the influence of the substances would require an examination to determine not only the presence of alcohol, but also the presence of THC or its metabolities. No examination for the presence of the latter was made in this case, he said, and no quantities of ethanol or THC were suggested by counsel for the expert's consideration of the question.[25]

The evidence clearly shows that Molina was able to conduct, without difficulty, the prolonged sale negotiations which occurred over several hours by telephone and in person at four different locations.

Molina's claim of error in the refusal of the intoxication instruction is meritless.

### 3. Sufficiency of the Evidence

■ Appellant argues that the evidence is "insufficient to meet the Government's burden of establishing absence of sudden quarrel and heat of passion beyond a reasonable doubt," which he says is done by presenting evidence "tending to establish its converse," i.e., that he "premeditatedly and with malice aforethought" killed Ramos. He claims failure of the evidence to establish such elements. Br. at 17.

A motion for judgment of acquittal was urged at the close of the Government's case in chief (5R–386–387, 389),[26] reurged at the close of the defense evidence (7R–807, 809) and reurged again at the conclusion of the Government's rebuttal evidence (8R–823, 840).

In examining for sufficiency, on review the appellate court should affirm, if viewing the evidence in the light most

---

**23.** 4R–350–51; 7R–820–21

**24.** 7R–801–05.

**25.** 7R–735–37, 740–42.

**26.** At the close of the Government's evidence in chief, the motion targeted (1) the Government's theory of murder during an *attempted escape* (the Court subsequently declined to instruct on that theory of the Government's case, *see* 8R–812, 855, 872, 932–33) and (2) the premeditated and malice aforethought theory of the charged murder.

As originally urged, the motion relating to the latter theory was phrased: "Just for the record, Your Honor, we would move for an instructed verdict as to the other way that murder is alleged in Count 3" (5R–387), but later in the record it appears it was counsel's intention, initially, to question the sufficiency of the evidence to prove that theory of the charge (5R–389). The motion in that respect was denied (8R–810). We proceed to consider the question as properly preserved for review.

**1208**

favorable to the jury verdict upholding the Government's case, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. *See, e.g., United States v. Austin,* 585 F.2d 1271, 1273 (5th Cir.1978) and decisions there cited.

*United States v. Barron,* 707 F.2d 125, 126–27 (5th Cir.1983). *See also United States v. Freeze,* 707 F.2d 132, 135 (5th Cir.1983); *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (*en banc*), *aff'd.* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

The relevant uncontroverted evidence discussed early on herein and in the "Intoxication" segment of this opinion meets the applicable test and amply supports the conclusion that the jury could have found the essential elements of the crime charged in Count Three were proven beyond a reasonable doubt. Molina's conviction on that count will be affirmed.

## COUNT FOUR

■ At trial, and before us, Molina has contended that Counts Three and Four were multiplicitous and subjected him to double jeopardy. He failed to convince the trial judge, and he fares no better here.

18 U.S.C. § 1111 defines the Federal crime of murder and prescribes the death penalty for murder in the first degree and life imprisonment for second degree murder. Section 1114 makes the punishment provided in § 1111 applicable in the case of murder of an officer or employee of the Drug Enforcement Administration while in the performance of his official duties. As already noted, Count Three charged Molina with murdering Agent Ramos in violation of §§ 1111 and 1114.

For use of a deadly weapon in the commission of a crime of violence, including one for which an enhanced punishment is provided by the statute denouncing the act, 18 U.S.C. § 924(c)(1), as applicable in this case, provides for a mandatory five year term of imprisonment to be imposed in addition and consecutively to the punishment provided for the crime committed. Count Four charged Molina used a firearm to murder Ramos as charged in Count Three.

Molina argues that Count Four and Count Three are but a single offense because Count Four "does not require proof of a fact not required for the Count Three conviction" [27] and that the double jeopardy clause requires reversal of his conviction and sentence on Count Four.

However, the jurisprudence does not support his claims. The Supreme Court has held that where cumulative punishment under two statutes is specifically authorized, as Congress has done in the statutes involved here, regardless of whether the statutes proscribe the same conduct under *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Government may seek, and the trial court may impose, cumulative punishment under such statutes in a single trial. *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

Accordingly, the foregoing considered, as to Count One, the case is remanded with instructions to strike from the sentence the term of supervised release and in all other respects the conviction and sentence on said Count One are affirmed; the conviction on Count Two is reversed and the case is remanded for further proceedings not inconsistent with this opinion; and the convictions on Counts Three and Four are affirmed.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

**27.** Br. at 45.