**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Suraphan TUANGMANEERATMUN,**
**Defendant–Appellant.**

No. 90–2036.

United States Court of Appeals,
Fifth Circuit.

Feb. 21, 1991.

---

Gordon M. White, Houston, Tex. (Court-appointed), for defendant-appellant.

Suraphan Tuangmaneeratmun, San Marcos, Tex., pro se.

Paula C. Offenhauser, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before REAVLEY, GARWOOD, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

Pursuant to a plea agreement, Suraphan Tuangmaneeratmun pleaded guilty to aiding and abetting the importation of heroin, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2. He challenges the validity of that plea, arguing that the district court failed to comply with Fed.R.Crim.P. 11. The primary issue is the court's failure to explain the "effect" of a term of supervised release; and although it erred by failing to do so, the error was harmless. We AFFIRM.

I.

In 1988 the Houston office of the Drug Enforcement Administration (DEA), in cooperation with other federal agencies, initiated an undercover investigation of Thai–Chinese heroin trafficking into the United States. Through contacts initiated by a government informant, DEA agents negotiated with Prawit Wattanachaisri, a Thai national living in Bangkok, Thailand, for a ten-kilogram shipment of heroin into the United States. The original plans for shipment of heroin from Tokyo to the United States were cancelled due to difficulties with delivery; and on May 5, 1989, Wattanachaisri negotiated with the DEA agents for the shipment of heroin from Bangkok. Final negotiations for the delivery of 2.5 kilograms of the ten-kilogram amount, at a price of $150,000 per kilogram, took place in Houston, Texas, on May 27, 1989.

On May 31, 1989, heroin of 68% purity, with a net weight of approximately 1.98 kilograms, was smuggled into Houston in small packages concealed inside the packaging of artifacts shipped from Bangkok. These packages were subsequently opened with the assistance of Wattanachaisri. He explained how the heroin was customarily shipped into the United States and described the heroin shipped as Chinese "tiger" or "lion," terms used by drug traffickers for the highest quality heroin.

The negotiations with Wattanachaisri were continued to permit the DEA to gather additional information against suspected co-conspirators. Wattanachaisri named "Junee" as the source of the heroin, explaining that Junee had been responsible for a 300–kilogram shipment of heroin that had been seized in Australia several months earlier.

On June 2, 1989, Wattanachaisri told the DEA agents that the sources for the heroin were demanding payment of $100,000 before shipping the remaining 7.5 kilograms. At that time, he identified Suraphan Tuangmaneeratmun as a high-ranking member of Junee's organization. On June 11, 1989, Wattanachaisri advised that a three-

kilogram shipment would be arriving the next day from Tokyo, accompanied by a Thai courier named Surachai Mongkolsupya. Mongkolsupya subsequently was arrested on Swiss warrants for drug trafficking; no heroin was found in his possession.

Wattanachaisri was arrested on June 19, 1989, and agreed to cooperate with the DEA. He made telephone contacts with his source of supply and arranged for Tuangmaneeratmun to arrive in the United States on June 24, 1989, to negotiate the final purchase price and collect payment for the initial shipment. When Tuangmaneeratmun arrived in Dallas, Texas, on June 24, he was met by undercover agents and accompanied to Houston.

During meetings in Houston on June 25 and 26, 1989, which were videotaped by the DEA, Tuangmaneeratmun indicated to the undercover agents not only that he was responsible for the above described 1.98 kilograms of heroin previously shipped to Houston, but also, that he had been forced to return seven kilograms of heroin to his Chinese source because he had been unable to secure the cash advance for the sale. He further stated during one of the videotaped meetings that he had employed four persons to package the heroin previously shipped to Houston and had bribed the Thai customs officers to assure safe passage of the heroin out of Thailand. According to the government, Tuangmaneeratmun appeared to be well-versed in the clandestine operations necessary to smuggle heroin from Thailand into the United States without detection and claimed responsibility for the shipment of 38 tons of "Thai stick" into the United States the previous year.[1]

Tuangmaneeratmun was arrested on June 26, 1989, in Houston. On July 17, 1989, he was indicted and charged with conspiracy to import into the United States in excess of one kilogram of heroin, in violation of 21 U.S.C. §§ 963, 952(a) and 960(a)(1) (count 1); and aiding and abetting the importation of approximately 2.5 kilograms of heroin, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2 (count 2). After counsel was appointed to represent him, Tuangmaneeratmun pleaded guilty on September 22, 1989, to count 2 in exchange for: (1) the dismissal of the remaining count; (2) the government's stipulation as to acceptance of responsibility under U.S.S.G. § 3E1.1; and (3) a recommendation by the government of an offense level of 34 under the Sentencing Guidelines.

A presentence report (PSR) was prepared after a presentence investigation. Neither party objected to the factual statements contained in the PSR; and at the sentencing hearing on December 8, 1989, the district court adopted those statements as its findings. Sentenced to 151 months imprisonment, five years of supervised release, and a $50 special assessment, Tuangmaneeratmun timely appealed.

Counsel for Tuangmaneeratmun originally filed an *Anders* brief,[2] stating that the plea fully conformed with the requirements of Rule 11 and that the sentence was properly assessed under the Guidelines. Denying counsel's concomitant motion to withdraw, this court directed counsel to "brief the sufficiency of the district court's explanation of the effects of supervised release and the effectiveness of Tuangmaneeratmun's plea given his statement that he was 'tricked' and given the interpreter's apparent confusion concerning the guidelines."

## II.

Tuangmaneeratmun contends that he is entitled to withdraw his guilty plea because: (1) he did not demonstrate the requisite mental culpability to enter a valid plea of guilty; and (2) the district court failed to explain both the effect of supervised release and the application of the Guidelines to him.

## A.

■ Concerning the contention that Tuangmaneeratmun did not demonstrate the requisite mental culpability to enter a valid guilty plea, it is clear, from both Tuangma-

---

1. According to the government, "Thai stick" is a very potent form of marijuana.

2. *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

neeratmun's brief and this court's order denying defense counsel leave to withdraw, that the factual basis for the plea is at issue, rather than the defendant's capacity to plead.[3]

Rule 11(f) requires a district court, before accepting a guilty plea, to conduct an inquiry sufficient to satisfy itself that there is an adequate factual basis for the plea. "To support a guilty plea, the prosecutor must present evidence to the subjective satisfaction of the district court which indicates that a defendant actually committed the offense to which he is pleading guilty." *United States v. Antone*, 753 F.2d 1301, 1305 (5th Cir.), *cert. denied sub nom. Hebert v. United States*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). "An acceptance by the court of the defendant's guilty plea is deemed to be a factual finding on each of these requirements and is reviewable under the clearly erroneous standard." *United States v. Davila*, 698 F.2d 715, 717 (5th Cir.1983).

■ At the rearraignment hearing on September 22, 1989, following the plea agreement, and after the prosecutor completed his recitation of the factual basis for the plea, the court asked Tuangmaneeratmun to explain in his own words his involvement in the case. Tuangmaneeratmun initially responded, through the interpreter, that he knew nothing; that "somebody tricked him to come"; and that the person who met him at the airport when he arrived in the United States told him what to say to the undercover officers.[4] Although these statements, considered alone and out of context, cast serious doubt upon whether Tuangmaneeratmun admitted his guilt for the offense to which he pleaded guilty, our review of the plea hearing record more than convinces us that the district court's implicit finding that Tuangmaneeratmun was guilty of the offense is not clearly erroneous.[5] Tuangmaneeratmun subsequently admitted at the rearraignment that he knowingly participated in the heroin offense and conceded that he made the statements attributed to him by the government during the videotaped negotiations for the heroin deal. And, he admitted that although he wanted to come to the United States to work, he was aware that he was being sent to the United States for the purpose of finding a buyer for heroin.

Accordingly, we hold that there is an adequate factual basis for Tuangmaneeratmun's guilty plea.

**B.**

Tuangmaneeratmun contends next that the district court failed to explain (1) the effect of supervised release and (2) the application of the Guidelines to him.

**1.**

At the plea hearing, the district court informed Tuangmaneeratmun twice that he could be sentenced to "imprisonment for not less than 10 years to life, a fine not to exceed $4 million and a period of supervised release of at least 5 years." However, the court did not explain the effect of the supervised release. And, at the end of the sentencing hearing, the probation officer requested that Tuangmaneeratmun be

---

**3.** Both parties discuss the issue under Rule 11(f), which provides:
> **(f) Determining Accuracy of Plea.** Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.

If the focus of the inquiry is directed to the defendant's understanding of the nature of the charges, however, Fed.R.Crim.P. 11(c), the record also supports a conclusion that Tuangmaneeratmun understood them.

**4.** Because Tuangmaneeratmun's native language is Thai, an interpreter was present at the rearraignment hearing. At times, the interpreter appeared to have trouble understanding what was said, and asked for some statements to be repeated. Tuangmaneeratmun does speak at least some English, however; he responded to some of the court's questions at the rearraignment in English and not through the interpreter.

**5.** Although the district court made no express finding of Tuangmaneeratmun's guilt, the court's acceptance of the plea is deemed to be a factual finding that Tuangmaneeratmun actually committed the offense to which he pleaded guilty. *See Antone*, 753 F.2d at 1305.

held so that the conditions of supervised release could be explained to him by an interpreter. The record thus indicates that Tuangmaneeratmun may not have understood the effect of supervised release.[6]

■ The procedures for accepting guilty pleas are specified in Rule 11. One of the three "core" concerns of Rule 11 is that a defendant understand the consequences of his plea, including an understanding of the possible penalties provided by law. *E.g., United States v. Bernal,* 861 F.2d 434, 436 (5th Cir.1988), *cert. denied,* — U.S. —, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989).[7] At the time Tuangmaneeratmun entered his guilty plea, Rule 11(c)(1) required the district court to inform a pleading defendant of the

> nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, *including the effect of any special parole term or term of supervised release* and, when applicable, that the court may also order the defendant to make restitution to any victim.

(Emphasis added.)

The government counters that no explanation, other than advising the defendant of the potential term of supervised release, was required. We disagree; that argument ignores the plain language of Rule 11. In *United States v. Molina–Uribe,* 853 F.2d 1193, 1200 (5th Cir.1988), *cert. denied,* 489 U.S. 1022, 109 S.Ct. 1145, 103 L.Ed.2d 205 (1989), this court held that Rule 11(c)(1) requires the district court to explain to a defendant how special parole will operate. And, as stated above, the Rule also ex-

pressly requires the court to explain the effect of a term of supervised release. Although supervised release and special parole differ in some respects, they are also quite similar; and this court has stated that special parole and supervised release "present only a distinction without a difference." *Id.* at 1197–98 (footnote omitted).

Regarding special parole, the Advisory Committee notes to Rule 11 in effect at the time of the entry of the plea explain that an admonishment about the effect of special parole should include more than a description of the potential term:

> Special parole is a significant penalty.... Unlike ordinary parole, which does not involve supervision beyond the original prison term set by the court and the violation of which cannot lead to confinement beyond that sentence, special parole increases the possible period of confinement. It entails the possibility that a defendant may have to serve his original sentence plus a substantial additional period, without credit for time spent on parole. Explanation of special parole in open court is therefore essential to comply with the Rule's mandate that the defendant be informed of "the maximum possible penalty provided by law."

> \* \* \* \* \* \*

> The amendment does not attempt to enumerate all of the characteristics of the special parole term which the judge ought to bring to the defendant's attention. Some flexibility in this respect must be preserved although it is well to note that the unique characteristics of

---

**6.** It is also possible, however, that the probation officer requested that Tuangmaneeratmun be held so that the standard conditions of supervised release recommended by the Sentencing Commission and imposed upon him by the district court could be explained to him. Those conditions included requirements that

> [w]hile on supervised release, the Defendant shall not commit a federal, state, or local crime; shall comply with the general rules of supervised release as adopted by the Court on December 7, 1987; and shall comply with the following conditions: he shall not—he's prohibited from possessing a firearm or other

dangerous weapon; if deported, he is not to return to the United States illegally.

The necessity of explaining these conditions to Tuangmaneeratmun does not necessarily lead to a conclusion that he did not understand the *effect* of a violation of any of the conditions during the term of supervised release. Nevertheless, the record does not contain any indication that the court explained such possible effects.

**7.** The three core concerns are: lack of coercion, comprehension of the charges, and knowledge of the plea's direct consequences. *United States v. Adams,* 634 F.2d 830, 838 (5th Cir.1981).

this kind of parole are such that they may not be readily perceived by laymen. *Moore v. United States, supra,* recommends that in an appropriate case the judge

> inform the defendant and determine that he understands the following:
>
> (1) that a special parole term will be added to any prison sentence he receives;
>
> (2) the minimum length of the special parole term that must be imposed and the absence of a statutory maximum;
>
> (3) that special parole is entirely different from—and in addition to—ordinary parole; and
>
> (4) that if the special parole is violated, the defendant can be returned to prison for the remainder of his sentence and the full length of his special parole term.

1982 Amendment Advisory Committee Note, Fed.R.Crim.P. 11(c)(1) (quoting *Moore v. United States,* 592 F.2d 753, 755 (4th Cir.1979)).

Likewise, supervised release has unique characteristics that might not be readily apparent to a layperson, including the possibility that a defendant may have to serve a number of years in prison, in addition to his original sentence of imprisonment, without credit for time already spent on supervised release. For example, if a defendant sentenced to a term of five years of supervised release violates a condition of supervised release after having served four years of the supervised release term, he is subject to imprisonment for an additional five full years, without any credit for the four years already served under the term of supervised release. *See* 18 U.S.C. § 3583(e)(3).

■ We therefore consider the expressly required explanation of the effect of supervised release to be essential to ensure compliance with Rule 11's more general express requirement that a defendant be informed of "the maximum possible penalty provided by law." We do not suggest that district judges can satisfy this requirement only by using a specific, rigid verbal formula. Obviously, as is the case with special parole, a certain amount of flexibility is both desirable and necessary. But, among other matters covered, the defendant should be informed that a term of supervised release is imposed in addition to any sentence of imprisonment and that a violation of the conditions of supervised release can subject the defendant to imprisonment for the entire term of supervised release, without credit for any time already served on the term of supervised release prior to the defendant's violation of those conditions.

Because the district court failed to explain the effect of the supervised release, we must determine whether that error is harmless. Rule 11(h) provides that "[a]ny variance from the procedures required by this rule which does not affect substantial rights shall be disregarded." In *United States v. Dayton,* 604 F.2d 931, 939–40 (5th Cir.1979) (en banc), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980), this court held that

> reversal [is] required only when there is an "entire failure" to address one of the three core concerns.... [I]f the core concerns are met, an "inadequate address" or less than "letter perfect" compliance with Rule 11 may be excused under harmless error analysis.

*Bernal,* 861 F.2d at 436 (quoting *Dayton,* 604 F.2d at 939–40). The 1983 amendment of Rule 11 to add the aforementioned harmless error provision does not alter this analysis. *Id.*

In *Molina–Uribe,* this court held that the "substantive" rights of the defendant were violated when he was not informed of the possibility of a term of special parole. 853 F.2d at 1199–1200.[8] The court set aside the guilty plea, without discussing the pos-

---

**8.** Rule 11(h) speaks of "substantial rights." As recently noted by this court in *United States v. Bachynsky,* 924 F.2d 561 (5th Cir.1991), prior cases have used the terms "substantive" and "substantial" interchangeably in discussing harmless error under Rule 11(h). "The use of the word substantive instead of substantial in these cases should not be read as changing the meaning of Rule 11(h)." *Id.* at n. 5.

sible applicability of harmless error analysis. The *Molina–Uribe* holding was recently extended in *United States v. Blair*, 902 F.2d 323, 324 (5th Cir.1990); there, the court held that a failure to inform a defendant of the possibility of a term of supervised release cannot be harmless error, even if the prison term together with the term of supervised release is less than the maximum prison term the defendant was told that he could receive.

In *Bachynsky, see* note 8, this court's most recent case addressing the subject of supervised release, the court, following *Blair*, vacated the defendant's sentence and remanded the case to permit the defendant to plead anew because the district court failed totally to inform Bachynsky that he could be subject to a term of supervised release as part of his sentence.

■ Here, contrary to *Blair* and *Bachynsky*, the district court informed Tuangmaneeratmun twice that he could receive a supervised release term "of at least 5 years." Accordingly, there was not an "entire failure" by the district court to address the subject of supervised release. Instead, the error here consists of the failure to explain the *effect* of the term of supervised release. Therefore, we hold that this failure is an "inadequate address," resulting in it being subject to harmless error analysis. *See Dayton*, 604 F.2d at 939–40. Our holding is consistent with the Advisory Committee Note to Rule 11(c)(1). After reviewing the explanation of the effect of special parole required under Rule 11, the Advisory Committee makes clear that a failure to provide such an explanation is not an automatic ground for reversal. It explains: "The amendment should not be read as meaning that a failure to comply with this particular requirement will inevitably entitle the defendant to relief." 1982 Amendment Advisory Committee Note, Fed.R.Crim.P. 11(c)(1).

■ Applying harmless error analysis, Tuangmaneeratmun is not entitled to withdraw his guilty plea unless his "substantial rights" have been affected by the district court's failure to explain the effect of supervised release. Rule 11(h). We hold that his substantial rights were not affected, because Tuangmaneeratmun has failed to demonstrate that he was prejudiced, i.e., that the district court's failure to explain the effect of supervised release caused him to plead guilty when he would not have otherwise done so. The evidence of his guilt was substantial, including statements made by him on videotape. In addition, the government dismissed the conspiracy charge and agreed to other conditions in exchange for his guilty plea. Knowing, among other things, that he could receive a sentence of life imprisonment, Tuangmaneeratmun chose to plead guilty. Here, the conditions of supervised release are not so onerous (as opposed to incarceration) that they would deter him from pleading guilty, particularly where, as here, the total sentence (imprisonment plus supervised release) totaled far less than the life sentence that Tuangmaneeratmun was warned that he could receive.

Although the district court erred in failing to comply with Rule 11's requirement that it explain the effect of a term of supervised release prior to accepting Tuangmaneeratmun's guilty plea, we hold that the error is harmless, because it did not affect his substantial rights.

### 2.

■ Effective December 1, 1989, Rule 11(c)(1) was amended to require the district court to advise the defendant that "the court is required to consider any applicable sentencing guidelines, but may depart from those guidelines under some circumstances." Although Tuangmaneeratmun entered his guilty plea prior to the effective date of that amendment, he argues that the district court erred by failing to explain the application of the Guidelines to him. This contention has no merit. Under Rule 11 as it existed at the time Tuangmaneeratmun entered his plea, the district court was not required to inform him about the applicable sentencing guideline range. And, the provisions in the plea agreement for the government's stipulation as to his acceptance of responsibility and recommendation of a total offense level of 34 according to

the Guidelines demonstrate that Tuangma-neeratmun was aware of the applicability of those Guidelines.

 Moreover, even under Rule 11 as recently amended, the district court is not required to " 'calculate and explain the Guidelines sentence' before accepting a guilty plea." *United States v. White,* 912 F.2d 754, 756 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 529, 112 L.Ed.2d 540 (1990) (quoting *United States v. Fernandez,* 877 F.2d 1138, 1143 (2d Cir.1989)). And even though it was not required to do so, the district court at least partially explained the application of the Guidelines at rearraignment, including the following:

> THE COURT: Under the Sentencing Reform Act of 1984 the United States Sentencing Commission has issued guidelines for Judges to follow in determining the sentence in a criminal case.

> THE DEFENDANT: Yes, ma'am.

> THE COURT: Have you and [y]our ... attorney talked about how the sentencing guidelines might apply to your case?

> THE DEFENDANT: Yes, ma'am.

> THE COURT: Do you understand that the Court will not be able to determine the guideline sentence for your case until after the presentence report has been completed and you and the government have had an opportunity to challenge the facts reported by the probation officer?

> THE DEFENDANT: I understand.

>     *    *    *    *    *    *

> THE COURT: So, in other words, the government may say we will recommend Level 34, but it's only after I see the presentence report that I may or may not agree that Level 34 is the proper level at which the sentence would be.

> THE DEFENDANT: Yes.

> THE COURT: And it's possible that under the sentencing guidelines the sentence that he receives might be more severe or it might be less severe than the level that has been recommended by the government's attorney.

> THE DEFENDANT: Okay.

> THE INTERPRETER: He understands.

Because an explanation of the application of the guidelines was not required, any insufficiency in the explanation provided cannot be grounds for reversal, especially when there is no evidence that it misled Tuangmaneeratmun as to the sentence he would receive.

### III.

For the foregoing reasons, we hold that Tuangmaneeratmun is not entitled to withdraw his guilty plea. Accordingly, the judgment of the district court is

AFFIRMED.