**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 94-30195
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ROY BROWN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
(May 30, 1995)

Before REYNALDO G. GARZA, GARWOOD and DAVIS, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

Roy Brown (Brown), a Jamaican national, was originally indicted, along with Steve Earl (Earl), for conspiracy to import marijuana into the United States, in violation of 21 U.S.C. §§ 952(a), 960, and 963. On September 15, 1993, after reaching a plea agreement with the government, Brown pleaded guilty to a superseding bill of information charging the same offense but specifying a lesser quantity of marijuana.[1] On March 16, 1994, Brown was sentenced to a 46 month imprisonment term and a three

_____

[1]Brown's co-defendant, Earl, was tried and convicted on the original indictment.

year term of supervised release.  Brown now appeals this sentence. For the reasons stated below, we affirm the district court.

BACKGROUND

The basic facts are undisputed.  Brown was involved in a conspiracy to import marijuana from Jamaica into Gramercy, Louisiana.  On August 23, 1993, the M/V GULF TRIDENT (TRIDENT) left Port Rhoades, Jamaica with two metal cylinders attached to the bottom of its hull.  These cylinders contained 281 pounds of marijuana.  On August 26, having been alerted to the possibility that the TRIDENT contained contraband, the U.S. Customs Service established surveillance on the vessel upon its arrival into the Port of Gramercy.

Approximately two days later, federal agents observed Brown, in the company of Earl and an unidentified SCUBA diver, near the river and in the vicinity of the TRIDENT.  The diver entered the Mississippi River and floated downstream to the TRIDENT.  Shortly before reaching the lighted area of the dock, the diver submerged, detached the cylinders from the hull of the vessel, and then secured the contraband to the bottom of the dock.  After re-joining Brown and Earl at the river's bank, the three men left the area.

The next evening, an unidentified driver left Stanford Reed (Reed), Earl, and Brown on River Road, close to the dock.  Reed, dressed in SCUBA gear, entered the river. Before the individuals had an opportunity to retrieve the cylinders from the dock, federal agents swooped in to make the arrests.  Earl was quickly apprehended, but both Reed and Brown evaded the agents.  After

2

several hours, Brown was arrested while attempting to leave a wooded area near the river. Reed, however, was not captured and currently remains at large.

After his indictment, Brown sang like a lark in exchange for the government's promise to recommend a lighter sentence. After receiving Brown's guilty plea, the United States fulfilled its promise by requesting that the district court not depart upwardly from the Sentencing Guidelines and select a sentence at the lowest end of the applicable guidelines range, i.e., 37 months. The district court, however, refused the government's request and sentenced Brown to a maximum incarceration term of 46 months.

## DISCUSSION

In the presentence report (PSR), the Probation Office calculated Brown's offense level at 17 and his criminal history category at IV, resulting in a guideline range of imprisonment from 37 to 46 months. Brown raised three objections to the PSR which he now pursues on appeal.

## I.

First, Brown objects to receiving two criminal history points under U.S.S.G. § 4A1.1(d)[2] for being on supervised release at the time of his arrest. Brown's term of supervised release commenced on October 1, 1990, but he argues that it was extinguished on October 31, 1990. Brown asserts that district courts may not allow

---

[2]Pursuant to U.S.S.G § 4A1.1(d), a defendant is to receive two additional criminal history points if he or she "committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status."

defendants to serve their terms of supervised release outside of the United States. Thus, he argues that a term of supervised release is effective only while the defendant remains in the United States. Because Brown was deported from the United States by order of the Immigration and Naturalization Service (INS), he asserts that his term of supervised release was extinguished. Therefore, Brown contends that he was not on supervised release when he was arrested on August 29, 1993.

Although there is no direct legal impediment to prohibit a court from allowing a defendant to serve his supervised release abroad, we have found no case in which a court has authorized a defendant to serve this term outside of the United States. On the contrary, at least two cases have held that the defendants had to serve their supervised release in the United States due to the practical difficulties inherent in supervising their release abroad. See United States v. Porat, 17 F.3d 660, 671 (3rd Cir. 1994)("[T]he court and the probation office have the responsibility to see that [defendant] complies with the terms of his sentence. In order to maintain the required supervision, we hold that [defendant] must serve his complete sentence in the United States."), petition for cert. filed, 63 U.S.L.W. 3067 (U.S. July 12, 1994) (No. 94-140); United States v. Pugliese, 960 F.2d 913, (10th Cir. 1992)("the district court's order and its remarks . . . mean that the structure needed to support defendant's rehabilitative supervision is absent outside the United States, [more specifically, in Thailand], and we agree with that

4

assessment."). Assuming arguendo that district courts do not have the authority to allow defendants to serve their terms of supervised release abroad, it does not necessarily follow that supervised release is extinguished upon deportation.

To begin with, we are unaware of any court which has held that deportation extinguishes a term of supervised release. Moreover, Congress has provided that:

> If an alien defendant is subject to deportation, *the court may provide, as a condition of supervised release, that he be deported and remain outside the United States*, and may order that he be delivered to a duly authorized immigration official for deportation.

18 U.S.C. § 3583(d). Congress has also mandated the following:

> An alien sentenced to imprisonment shall not be deported until such imprisonment has been terminated by the release of the alien from confinement. Parole, supervised release, probation, or possibility of rearrest or further confinement in respect of the same offense shall not be ground for deferral of deportation.

8 U.S.C. § 1252(h). A plain reading of these two sections supports the government's position that deportation does not extinguish supervised release. Otherwise, Congress would not require that a defendant be deported despite a term of supervised release and at the same time allow for supervised release to be conditioned on the defendant not reentering the United States illegally. If Congress intended for deportation to terminate this sentence, it could have specifically provided for such to occur. However, Congress has not done so and viewing the legislation above, it has no such intent.

In addition, and contrary to Brown's argument,[3] the courts

---

[3]Brown cites two cases which allegedly support his contention that supervised release is extinguished upon deportation. These

recognize that a term of supervised release remains intact after an alien's deportation.  For example, in <u>United States v. Soto-Olivas</u>, 44 F.3d 788 (9th Cir.1995), <u>petition</u> <u>for</u> <u>cert.</u> <u>filed</u>, (U.S. May 8, 1995) (No. 94-9173), the defendant was sentenced to prison for 36 months, to be followed by six years of supervised release.  As one of the conditions of his supervised release, the district court ordered the defendant to "comply with the rules and regulations of the [INS] and if deported from this country under any circumstances, not to reenter the United States illegally."  After completing his prison term, the defendant was deported.  However, several months later, during his term of supervised release, he was arrested on auto theft charges in the Los Angeles area.  During a subsequent revocation hearing, the defendant was sentenced to seven months incarceration for violating the condition in his supervised release that he not reenter the United States.  Although the

cases support nothing of the sort, they merely recognize the impossibility of imposing an effective program of supervised release on a defendant who is to be deported.  For example, in <u>United States v. Ceja-Hernandez</u>, 895 F.2d 544 (9th Cir. 1990), the district court justified an upward departure on the defendant's sentence on the ground that the defendant would be immediately deported following his release from prison, precluding the court from effectively imposing a program of supervised release.  The Ninth Circuit, having held that the district court's basis for the departure was impermissible, reversed the sentence.  In <u>United States v. Chavez-Botello</u>, 905 F.2d 279 (9th Cir. 1990) (per curiam), the district court stated, among other things, that the Sentencing Guidelines failed to take into account the fact that the defendant would avoid being placed on supervised release after being deported.  Therefore, it departed upwards on the defendant's sentence.  Again, the Ninth Circuit reversed on the basis that a "departure based upon the ground that a defendant would be immediately deported following release is not permissible." <u>Id.</u> at 281.  Again, not even by the farthest stretch of the imagination do these cases support the notion that deportation extinguishes supervised release.

6

question of whether deportation ended his term of supervised release was not at issue in the case, the Ninth Circuit affirmed the sentence. The facts and holding from this case indicate that a term of supervised release is not extinguished upon deportation.

In United States v. Valdez-Gonzalez, 957 F.2d 643 (9th Cir. 1992), the defendants served their prison terms and were deported. The Ninth Circuit indicated that if either of the defendants were rearrested in the United States during their terms of supervised release, their supervised release time would be converted into incarceration time. Again, this is a clear indication that deportation does not extinguish a term of supervised release.

This Court has also recognized that a term of supervised release does not terminate after a defendant is deported. See, e.g., United States v. Tuangmaneeratmun, 925 F.2d 797, 802 n.6 (5th Cir. 1991) (standard conditions of supervised release which should be explained to a defendant include, among other things, that if deported he is not to return to the United States while on supervised release); United States v. Osiemi, 980 F.2d 344 (5th Cir. 1993) (district court conditioned supervised release on the condition that if deported, defendant would not illegally reenter the United States); United States v. Cardenas-Alvarez, 987 F.2d 1129 (5th Cir. 1993) (district court sentenced defendant to a term of imprisonment of 100 months and ordered him not to reenter the United States illegally during a three year term of supervised release); see also United States v. Ramirez, 948 F.2d 66 (1st Cir. 1991) (as a condition of supervised release, if ordered deported,

7

defendant shall remain outside the United States during that time).

Section 3583(d) expressly provides, as a condition of supervised release, that the defendant be deported and remain outside the United States.  As discussed above, several cases have incorporated this section into their sentence of supervised release, i.e., that, if the defendant is deported, he remain outside of the United States during his term of supervised release. This is a clear indication that a term of supervised release remains in effect after the defendant is deported.[4]  In fact, the Probation Manual supports this conclusion because it directs that:

> Officers should provide supervision to offenders subject to deportation until the person actually leaves the United States.  Officers should then verify deportation through the [INS] <u>before making the case inactive until the scheduled expiration date</u> . . . .  <u>An offender reentering the country prior to expiration of supervision should be supervised.</u>

X PROBATION MANUAL, GUIDE TO JUDICIARY POLICIES AND PROCEDURES IV, § 18 (emphasis added).  It is doubtful that Congress intended for one branch of the government to extinguish a lawfully imposed sentence of another branch without specifically so providing.  Therefore, we hold that Brown's three year term of supervised release was not extinguished when he was deported.

## II.

Brown next argues that the district court erred in assessing him three criminal history points under the applicable section of

---

[4]<u>But</u> <u>see</u> <u>United States v. Biyaga</u>, 9 F.3d 204 (1st Cir. 1993), where the reviewing court approved of the district court's practice, when sentencing illegal aliens, to suspend supervised release from the time the defendant was deported until, and if, he returned to the United States.

the Sentencing Guidelines, which mandates that a defendant receive three criminal history points for "each prior sentence of imprisonment exceeding one year and one month." U.S.S.G. § 4A1.1(a). On October 14, 1986, Brown received two five year terms of probation after pleading guilty in Texas state court to separate counts of forgery and possession of marijuana. On January 21, 1987, he was arrested for illegal possession of a firearm. As a result of this arrest, Brown's probation was revoked on April 16, 1987 and he was ordered to serve a two year prison sentence. On April 27, 1987, Brown was sentenced to prison for 45 days for the firearm offense itself. Brown was eventually released from custody on June 19, 1987. Brown contends that his immediate release from custody after completing the firearm sentence proves that he did not serve any time for his 1986 convictions. Otherwise, he argues that he would not have been released on June 19, 1987, only two months after his probation was revoked. Therefore, Brown maintains that he has not served a prior term of incarceration exceeding one year and one month and contests the three points assessed against him.

The government, when seeking to adjust a defendant's sentence level, has the burden of proving by a preponderance of the evidence the facts necessary to support the adjustment. United States v. Kim, 963 F.2d 65, 69 (5th Cir. 1992). "In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable

9

at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).

The Sentencing Guidelines define "sentence of imprisonment" as "a sentence of incarceration and refers to the maximum sentence imposed."  Id. § 4A1.2(b)(1).  "If part of a sentence of imprisonment was suspended, `sentence of imprisonment' refers only to the portion that was not suspended."  Id. § 4A1.2(b)(2).  The commentary to this section clarifies that "to qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence (or, if the defendant escaped, would have served time) . . . .  That is, criminal history points are based on the sentence pronounced, not the length of time actually served."  Clearly, the Sentencing Guidelines require that (1) a sentence exceed one year and one month and (2) that some time actually be served on that sentence before assessing three additional points to a defendant's criminal history.  Brown has satisfied the first requirement because the sentence of imprisonment pronounced was for two years.  Thus, the question is whether any time was actually served on that sentence.

Brown was taken into custody on January 21, 1987 and was released from prison on June 19, 1987.  During that five month period, Brown served his weapon's sentence, i.e., from April 27 to June 11, but he argues that no jail time was served on the two year

10

prison sentence. However, the "pen pack,"[5] which was introduced into evidence without objection, clearly states that on April 16, 1987 Brown was given a 53 day credit on his two year sentence of imprisonment for time already served. Thus, it is clear that Brown served at least 53 days from the two year term. However, a discrepancy exists between the days credited to Brown (53) and the days he spent in jail before being sentenced (85). The record does not shed any light on the 32 days (85 - 53) apparently spent in jail and to which Brown was presumably entitled to as a credit. Outside of conclusory allegations, neither of the parties attempt to account for these 32 days and this Court will not speculate as to the reasons why those 32 days are unaccounted for. Nonetheless, this discrepancy is inapposite because the government conclusively established by a preponderance of the evidence that 53 days were served on the sentence of imprisonment.

Finally, the PSR explains that Brown was released from prison because he was paroled on June 19, 1987 and finally discharged on February 23, 1989 (two years from April 16, 1987 with a 53 day credit). Contrary to Brown's assertion, the execution or imposition of the two year sentence was not suspended. The district court did not err in imposing the assessment.

### III.

Brown also argues that he should receive a two point reduction in his offense level under U.S.S.G. § 3B1.2(b) given that he was

---

[5]The "pen pack," issued by the Texas Department of Corrections, detailed the reasons for Brown's incarceration and the term to be served.

allegedly a "minor participant" in the drug conspiracy. Both parties characterize the marijuana shipment as involving a multi-level international smuggling scheme, consisting of peripheral participants and higher level participants, such as the scheme's organizers. Brown alleges that his involvement in the operation was merely peripheral as it was limited to helping Reed and Earl transport the marijuana from the dock; he denies complete knowledge or understanding of the scope of the conspiracy. Accordingly, Brown seeks a downward adjustment to reflect this supposed minor participation.

This Court will uphold a defendant's sentence unless it was imposed contrary to law, as a result of an incorrect application of the Sentencing Guidelines, or is outside of the range of the Sentencing Guidelines and is unreasonable. United States v. Buenrostro, 868 F.2d 135, 136-37 (5th Cir. 1989), cert. denied, 495 U.S. 923 (1990) (citations omitted). The district court's factual findings regarding sentencing matters are entitled to substantial deference; we will not disturb those findings unless they are clearly erroneous. United States v. Gadison, 8 F.3d 186, 193 (5th Cir. 1993). A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole. Id. We review the district court's interpretation of the Sentencing Guidelines de novo. Id.

The Sentencing Guidelines provide that a district court must reduce a defendant's offense level by two levels if the defendant was a "minor participant" in the criminal activity. U.S.S.G. §

12

3B1.2(b). A minor participant is a defendant who is "less culpable than most other participants, but whose role could not be described as minimal." Id., Application note 3. A downward adjustment under section 3B1.2 is generally appropriate only where a defendant was "`*substantially less culpable* than the average participant.'" Buenrostro, 868 F.2d at 138 (emphasis in original) (quoting U.S.S.G. § 3B1.2, Background). Brown bears the burden of proving his minor role in the offense by a preponderance of the evidence. United States v. Zuniga, 18 F.3d 1254 (5th Cir.), cert. denied, --- U.S.---, 115 S.Ct. 214 (1994).

At sentencing, the district court disagreed with the characterization of Brown's role in the offense as minor.[6] Indeed, the evidence suggests that Brown was not "substantially less culpable" than the average participant. For instance, he traveled from Texas to Louisiana to participate in the conspiracy; stayed at a motel in Gonzalez, Louisiana while his confederates stayed in Laplace, Louisiana - a move designed to mask their drug activities and avoid being captured in case they were discovered; assisted accomplice Earl, the diver, and others on two occasions in an attempt to stealthily retrieve 281 pounds of marijuana from the TRIDENT; and would have aided in transporting it to points unknown if not intercepted by federal agents. In light of these facts, the

---

[6]The following exchange occurred during sentencing:
ATTORNEY:  Well, I won't take up much time as long as it's clear that our position is that . . . there should be a two point reduction in Mr. Brown's minor role in the offense.
THE COURT: I obviously don't agree with that.

13

district judge was not bound to accept Brown's self-serving declarations, made with the purpose of reducing his sentence, about his role in the crime.  Buenrostro, 868 F.2d at 138.

Moreover, because most offenses are committed by participants of roughly equal culpability, the adjustment is intended to be used infrequently.  United States v. Allibhai, 939 F.2d 244, 254 (5th Cir. 1991), cert. denied, 507 U.S. 1072 (1992).  As the Buenrostro court noted, Brown may be a courier without being substantially less culpable than the average participant.[7]  Id.  "Culpability is a determination requiring sensitivity to a variety of factors."  Id.  Based on the evidence before us, we find no error in the district court's conclusion that Brown did not prove that he was a minor participant; he was just as culpable as the other criminal participants.

## IV.

Alternatively, Brown argues that if we cannot conclude that Brown was substantially less culpable than other members of the conspiracy, that the issue be remanded to the district court for a more complete articulation of the factual basis of its conclusion

---

[7]"[E]ven if the defendant were purely a courier having no knowledge of the other aspects of the drug-dealing operation, the defendant might nonetheless be a highly culpable participant in the operation.  A courier who willingly undertakes illegal transit without asking may questions is especially valuable to a criminal organization.  When police apprehend a studiously ignorant, courier, the organization can rest comfortably, knowing that its other operations remain hidden from the law." Buenrostro, 868 F.2d at 138.  But see United States v. Valdez-Gonzalez, 957 F.2d 643, 647 (9th Cir. 1992) (role in drug trade played by "mules" may constitute a mitigating circumstance justifying a downward departure under § 3B1.2).

14

that he was not a minor participant.

Determining participant status is a complex fact question, which requires a court to consider the broad context of the defendant's offense. United States v. Melton, 930 F.2d 1096, 1099 (5th Cir. 1991) (citing Mejia-Orosco, 868 F.2d 807, clarifying on reh'g, 867 F.2d 216 (5th Cir.), cert. denied, 492 U.S. 924 (1989)). In Melton, the court found the record to be woefully inadequate to determine whether the defendant was entitled to a downward adjustment, a deficiency compounded by the district court's refusal to articulate his findings after being requested to do so by the defendant. This court held that

> The district court must articulate the factual basis for the finding that, in this particular offense, [defendant] was an average participant. The sentencing court must state for the record the factual basis upon which it concludes that a requested reduction for minor participation is, or is not, appropriate.

Id.

In making factual determinations, we note that a district court may "draw [] inference[s] from a variety of data, including information in the [PSR] and the defendant's statements and demeanor at the sentence hearing." Mejia-Orosco, 867 F.2d at 220-21. The PSR generally bears sufficient indicia of reliability to be considered as evidence by the district court in resolving disputed facts. United States v. Montoya-Ortiz, 7 F.3d 1171, 1180 (5th Cir. 1993). A district court may thus adopt facts contained in the PSR without further inquiry if the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence. United States v. Puig-Infante, 19 F.3d 929, 943 (5th

15

Cir.), <u>cert.</u> <u>denied</u>, ---U.S.---, 115 S.Ct. 180 (1994).

The district court stated that due to the "reasons . . . set forth by the probation department," Brown's objections, including his objection for not receiving a two point downward adjustment under § 3B1.2(b), were denied. The judge specifically rejected Brown's contention that he played a minor role in the offense. At no point prior to this appeal did Brown request the court to articulate the factual basis for its finding. Moreover, because we do not find the sentencing record to be inadequate in this respect, there is no need for the court to regurgitate the basis for denying the downward departure after adopting the PSR, which sufficiently articulates the basis for the denial. For example, after Brown objected to the PSR's recommendation that he not receive a two point deduction in his sentence, the Probation Department again reviewed the particular facts of the case in a supplemental addendum and concluded that

> Brown is as culpable as any of the other participants in this scheme. He was present on the bank of the river to supervise the SCUBA diver's efforts to retrieve the canisters from the hull of the ship. He was again present to supervise the retrieval of the canisters from the dock. Brown's persistent presence at the site precludes the possibility that he was a minor participant in this scheme.

However, Brown further argues that additional facts were revealed after the PSR was prepared, during his co-defendant's (Earl's) trial, which were allegedly not considered by the lower court; facts allegedly supporting the downward adjustment. This argument is meritless. Not only does the evidence not suggest that he was "substantially less culpable" than the other members of the

16

conspiracy, but even so, his argument that the more complex the smuggling scheme becomes, the less culpable he becomes is inconsistent with <u>Buenrostro</u>.  Simply claiming that a complex scheme is involved and that he is a mere courier does not automatically entitle a defendant to the deduction. <u>See</u> <u>Buenrostro</u>, 868 F.2d at 138.  Finally, the sentencing judge presided over Earl's trial prior to sentencing Brown.  He was aware of all the facts relating to the conspiracy before ruling that Brown was not a minor participant.[8]  This disposes of the contention that the judge was not privy to all the facts relating to the conspiracy. The downward adjustment was properly denied.

### CONCLUSION

For the reasons stated, the sentence imposed by the district court is, in all respects,

AFFIRMED.

---

[8]"In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).