**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-40100
(Summary Calendar)
_____

UNITED STATES OF AMERICA,

Plaintiff/Appellee,

versus

VIRGIL SMITH ROBINSON, III,

Defendant/Appellant.

_____

Appeal from United States District Court
for the Southern District of Texas
(G-94-CR-1-1)
_____

(October 13, 1995)

Before JOLLY, JONES, and STEWART, Circuit Judges.

PER CURIAM:[*]

Virgil Smith Robinson, III appeals the sentence imposed by the district court because he claims the court used unreliable evidence to determine the amount of marijuana for which he was accountable under the sentencing guidelines calculations. For the following reasons, we affirm.

---

[*] Local Rule 47.5 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that Rule, the Court has determined that this opinion should not be published.

## FACTS

Counts One and Three of the indictment charged appellant Virgil Robinson, III), Jimmy Rebman, William Salway, Dianne Rebman, Teresa Jones, Bradley McCoy, and Eden Churchill Chin with conspiracy to possess and possession of marijuana. Counts Two and Four charged Robinson, Rebman, Salway and Chin with conspiracy to import and importation of marijuana. The dates alleged for the conspiracies are from about August 1993 through December 22, 1993. Chin, who was known as "Church," was the ringleader. After Robinson pled guilty to the two conspiracies and the possession counts, the court dismissed Count Four, which alleged importation, as to him. Robinson did not have a plea agreement.

As the factual basis for Robinson's plea, the Assistant U.S. Attorney stated that Robinson, Rebman, Salway, and Chin agreed to import a large quantity of marijuana into the United States from Jamaica. In accordance therewith, on November 30, 1993, Robinson, Rebman and Salway sailed the vessel GOOD TIMES from Seabrook, Texas, to Jamaica. They returned to Texas on December 19, 1993, with their vessel loaded with 477 kilograms (c. 1051 pounds) of marijuana. The GOOD TIMES met a 22-foot Wellcraft boat on the intercoastal waterway in the Sergeant, Texas, area, at which time all of the defendants except Chin loaded the marijuana onto the Wellcraft. After these six defendants were arrested, Rebman cooperated with Customs by making a controlled delivery of the

2

marijuana to Chin in New York. Robinson agreed that these factual representations were true.

The Presentence Report calculated that Robinson's relevant conduct involved a total of 2651 pounds of marijuana. This was based on 400 to 600 (calculated as 400) pounds which Rebman and Robinson brought from Jamaica to Freeport, Texas, aboard the SALUS, on some date after September 1, 1990. This marijuana was transferred to a smaller boat and then to a Dodge motor home. The motor home was driven to Chin's residence in Huntington, New York, where it was unloaded. Rebman and Robinson were paid about $150,000 for this marijuana.

After the SALUS was sunk accidentally, Chin bought the vessel HAPPY HOURS. Rebman, Robinson, and two others sailed this vessel to Jamaica, where it was loaded with 600 pounds of marijuana. They transported this marijuana to Chin's residence as they did in the September 1990 operation.

In April 1991, Rebman and Robinson again sailed the HAPPY HOURS from Texas to Jamaica, where they loaded it with 600 pounds of marijuana. They brought this load to Lacombe, Louisiana and transferred it to a mobile home. This vehicle then was driven to Chin's New York residence, where the marijuana was unloaded and stored.

On April 29, 1991, after an FBI search in New Orleans, officials seized the HAPPY HOURS and found about three pounds of marijuana on board. Some of Chin's subordinates were prosecuted and convicted in related cases, which interrupted Chin's, Rebman's and Robinson's smuggling activities until about November 1, 1993.

3

On that date, a confidential informant informed Customs Agents that Rebman had offered to pay her $20,000 to sail with him, Robinson, and Salway to Jamaica aboard the GOOD TIMES. The object was to pick up the marijuana which was involved in the instant case.

Robinson objected to the Presentence Report's inclusion of the 1600 pounds of marijuana smuggled during the three earlier trips to Jamaica as relevant conduct. He argued, inter alia, that the information regarding these three trips was "unreliable hearsay from an unidentified cooperating coconspirator." The probation officer maintained that there were sufficient indicia of reliability to support this information. He stated that it was obtained from two individuals who had been arrested, and that it "was corroborated and led to the conviction[s] of Charles Scott and his son David Charles Scott on charges of money laundering drug proceeds and conspiracy to distribute marijuana."

The defendants had a lengthy evidentiary hearing on their motions to suppress evidence. At the hearing, Customs Agent Timothy Unger testified that he learned of Robinson's and Rebman's previous trips to Jamaica by accessing reports of Customs agents in Florida by computer. The reports stated that in April and November 1992, Charles Scott had provided information that Robinson and others had been involved in smuggling marijuana from Jamaica. Unger testified that the reports "indicated that [Scott] was a reliable source because he had been cooperating with DEA and Customs involving some property in New Mexico." Unger also testified that he overheard Rebman tell the confidential informant

4

in Texas of some of his previous trips to Jamaica to get marijuana.

Based on 2651 pounds (1205 kilograms (KG)) of marijuana (being at least 1000 KG), the Presentence Report calculated Robinson's base offense level at 32 under § 2D1.1(c)(6) of the Sentencing Guidelines. If only the 1051 pounds (477 KG) involved in the principal offense had been counted, under § 2D1.1(c)(8)of the Sentencing Guidelines, Robinson's base offense level would have been 28 because it was at least 400 KG but less than 700 KG. Robinson received a three-level reduction for acceptance of responsibility. With a total offense level of 29 and a criminal history category of III, his guideline imprisonment sentencing range was from 108 to 135 months. The district court adopted the factual findings and the guideline applications stated in the Presentence Report. The district court imposed three concurrent prison terms of 120 months, plus five years of supervised release.

At Robinson's sentencing hearing, his counsel again objected to the court's consideration of his prior trips to Jamaica. Counsel argued that the names of the two arrested individuals who provided this information had not been revealed and that the Presentence Report addendum did not state how the information may have been corroborated. The Government called on Agent Unger for a response, although the record does not show that he was sworn as a witness in this proceeding. Unger stated that he did not know the identity of the Florida informants. However, he stated that he knew that "they were documented customs informants; and in order

5

for them to be documented informants, they have to be proven reliable."

The prosecutor also reminded the court of taped conversations in which Rebman told the Texas confidential informant that she did not need to be concerned about getting caught because of how they had conducted the operation, i.e., the trips to Jamaica, in the past. The defense did not present any rebuttal evidence on this point. The district court held that the previous trips would be considered as relevant conduct because "there is a reasonable likelihood that [evidence of the prior trips was] more reliable than less [re]liable." The court also overruled the defense objection that the prior trips were too remote in time to be considered relevant conduct.

## DISCUSSION

Robinson contends that the district court erred by basing his sentence on the assertions that he was involved in prior trips to Jamaica for marijuana because the supporting data was unreliable hearsay. His argument rests on Unger's lack of personal knowledge that Charles Scott was a reliable informant, in spite of Unger's testimony that Scott implicated Robinson as having gone on the previous trips. Robinson also argues that his admission that Chin had paid him money in Florida, and that the trailer Robinson used to drive the Wellcraft power boat to the beach house (where the agents seized it) was identified by Florida authorities as having been used to transport drugs, did not implicate him in the prior trips to Jamaica. We find that Robinson's arguments are meritless.

6

"When calculating quantities of drugs upon which to base a sentence, quantities not specified in the indictment, if part of the same scheme, course of conduct, or plan, may be used to determine the base offense level." United States v. Rogers, 1 F.3d 341, 345 (5th Cir. 1993). Such a calculation "represents a factual finding, which must be established by a preponderance of the evidence." United States v. Mitchell, 31 F.3d 271, 277 (5th Cir.), cert. denied, 115 S. Ct. 455, 649 (1994). This Court "will uphold the factual findings made by a district court in its determination of a defendant's relevant conduct for sentencing purposes unless that [finding] is clearly erroneous." United States v. Puig-Infante, 19 F.3d 929, 942 (5th Cir.), cert. denied, 115 S. Ct. 180 (1994). A factual finding which is plausible in light of the entire record is not clearly erroneous. Id.

For purposes of assessing facts in the sentencing context, we have sanctioned the use of various materials which do not perfectly coincide with the rules of evidence but which the district court may glean sufficient reliability. "Admissibility for trial" is not the yardstick used to measure whether particular information is suitable for a sentencing calculation. "In making factual determinations, . . . a district court may draw [] inference[s] from a variety of data, including information in the [Presentence Report]. . . . The [Presentence Report] generally bears sufficient indicia of reliability to be considered as evidence by the district court in resolving disputed facts [relative to sentencing]." United States v. Brown, 54 F.3d 234, 242 (5th Cir. 1995) (citation and quotation marks omitted). The district court can adopt facts

contained in a Presentence Report without further inquiry, provided that those facts had an adequate evidentiary basis, and the defendant does not present rebuttal evidence. Puig-Infante, 19 F.3d at 943; Rogers, 1 F.3d at 345; and United States v. Rodriques, 897 F.2d 1324, 1327-28 (5th Cir.), cert. Denied, 498 U.S. 857, 111 S. Ct. 158, 112 L. Ed. 2d 124 (1990). Furthermore, even "out-of-court declarations by an unidentified informant may be considered where there is good cause for the nondisclosure of his identity and there is sufficient corroboration by other means." Rogers, 1 F.3d at 343.

Robinson relies on United States v. Shacklett, 921 F.2d 580 (5th Cir. 1991), to support his contention that the informants' statements concerning his earlier trips to Jamaica were insufficiently reliable. Shacklett is factually distinguishable in that the Government conceded that it could not confirm the probation officer's finding concerning the quantity of drugs involved, which this court found to be no more than his "conclusory statement." 921 F.2d at 584.

In Robinson's case, the district court's total-quantity finding was supported both by reliable information in the Presentence Report and by evidence presented at the suppression hearing, which the district court had reviewed. The Presentence Report stated relevant details of Robinson's three previous trips to Jamaica to obtain marijuana. This information came from the Florida case agent's reports which led to the federal convictions of Charles Scott and his son.

8

Furthermore, Agent Unger testified at the suppression hearing that Scott had admitted his involvement in Chin's Jamaican marijuana-smuggling operation and that Scott had disclosed the names of other participants, including Robinson. Unger testified that Scott's reliability as a source of information was shown by his having cooperated previously with the DEA and Customs. Unger asserted that he had no reason to doubt or disagree with the information he received from the Florida agents concerning Robinson's prior participation in the conspiracy. At Robinson's sentencing hearing, Agent Unger testified further that this information also was obtained from documented confidential informants in Florida, who by necessity must have been proven reliable. Robinson was unable to impeach Unger's testimony.

Further, even if we assumed that the truthfulness of the confidential informants was questionable, the district court in the present case was free to rely on their information because of the enormous amount of detail related in their accounts. "Uncertainty about the veracity of an informant can . . . be compensated for by detail of the statement or internal consistency of the statement and surrounding facts." United States v. Privette, 947 F.2d 1259, 1262 (5th Cir. 1991), cert. denied, 503 U.S. 912, 112 S. Ct. 1279, 117 L. Ed. 2d 505 (1992). The Presentence Report shows that the confidential informants described Robinson's prior trips to Jamaica in detail, stating the dates of the first and third trips, the routes traveled, the quantities of marijuana involved in each trip, the names of the vessels involved, and how the marijuana was transported to Chin's New York residence. Customs agents

9

corroborated the information concerning the first trip by researching records of the Blue Lightning Information Systems.

The sources which the district court relied on relative to Robinson's prior trips to Jamaica bear sufficient indicia of reliability to support the probable accuracy of this information. Robinson, however, did not present any evidence concerning the amount of marijuana for which he should be held accountable. Because Robinson failed to meet his burden of showing that the relevant Presentence Report data, or Agent Unger's testimony, was materially untrue, the district court was entitled to credit this information in determining Robinson's sentence. See United States v. Valencia, 44 F.3d 269, 274 (5th Cir. 1995).

## CONCLUSION

For the foregoing reasons, the judgment of the district court is hereby AFFIRMED.