IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-30356
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CALVIN BROWN, JR.; JESSE L. CAGE,

Defendants-Appellants,

- - - - - - - - - -
Appeal from the United States District Court
for the Eastern District of Louisiana
(98-CR-194-3-G)
- - - - - - - - - -
June 7, 2001

Before DAVIS, WIENER, and STEWART, Circuit Judges.

WIENER, Circuit Judge:[*]

Defendants-Appellants Calvin Brown, Jr. and Jesse L. Cage (collectively "Defendants") challenge their convictions and their sentences for possession with the intent to distribute and conspiracy to possess with the intent to distribute cocaine hydrochloride ("cocaine"). The jury found that each undertook actions, individually and as part of a conspiracy, to sell cocaine in the New Orleans area. Both challenge, inter alia, the sufficiency of the evidence, the district court's admission of

_____

[*] Pursuant to 5TH Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH Cir. Rule 47.5.4.

evidence gathered via a wiretap, and several of the district court's sentencing determinations. For the most part, we find their contentions to be without merit; however, they do correctly argue that the period of supervised release to which they were sentenced violates their constitutional rights. Therefore, we affirm the judgment of the district court except as to that issue, which we vacate and remand for modification.

## I. *Facts and Proceedings*

Defendants' convictions stem from their alleged roles in a conspiracy to distribute cocaine in New Orleans. The picture that the government painted at trial, and that the jury apparently accepted, portrayed Cage as the leader of a conspiracy comprising (at a minimum) himself, Brown, and another man, Fred Easterling.

A joint investigation by the Drug Enforcement Administration ("DEA") and Louisiana State Police uncovered evidence that Defendants were conspiring with each other and others to sell cocaine in New Orleans. Federal and state agents obtained a warrant from a Louisiana state judge authorizing a wiretap to intercept conversations over a telephone line used by Cage. The agents recorded many conversations between Cage and Brown that occurred between May 18 and June 18, 1998. Although drugs and money were never explicitly mentioned, Defendants did discuss numbers and debt.

2

Easterling entered into a plea agreement with the government and testified at trial. He admitted that on approximately four different occasions, he purchased a quarter kilogram of cocaine from Cage, paying $5,500 for each quarter-kilogram. In June of 1998, Easterling used the telephone to purchase approximately 1½ kilograms of cocaine from Cage for $29,000. On June 15, Cage traveled to Easterling's house in Alabama and picked up the $29,000, leaving shortly thereafter to pick up the cocaine in Houston. Agents conducted surveillance of Cage throughout his journey. In Houston, Cage was observed entering a business premises owned by co-defendant Jose Diaz,[1] then leaving it in possession of a brown box. Cage was followed to a motel where he discarded the brown box. Agents recovered the box, and a drug dog alerted to it. During his return trip from Houston to New Orleans on June 18, 1998, Cage was stopped for speeding. He was given a traffic citation and consented to a search of his vehicle. The police found approximately two kilograms of cocaine in Cage's vehicle and arrested him.

Easterling testified that he met Brown on one occasion: After Easterling received poor quality cocaine from Cage, Brown tested the substance for them and confirmed that it was in fact "bad." Cage then replaced that "bad" cocaine with "good" cocaine.

---

[1] Diaz, Cage's alleged source of supply, was tried with Defendants but because the jury was not able to reach a verdict as to his guilt or innocence, a mistrial was declared as to him.

Evidence was also introduced showing that in October of 1998, an undercover agent met Brown in a Burger King parking lot to purchase two ounces of cocaine from him. When Brown approached the agent's vehicle, he got out and identified himself to Brown as a law enforcement officer. Brown fled, discarding approximately two ounces of cocaine (which police later recovered) before he was apprehended.

A jury found Brown and Cage guilty of (1) conspiring with each other and with others to possess with the intent to distribute cocaine in violation of 21 U.S.C. § 846 and (2) possessing with the intent to distribute cocaine in violation of 21 U.S.C. § 841. During sentencing, the district court concluded that Brown had one prior drug conviction and that Cage had two, and enhanced their criminal history scores accordingly. The court also increased Cage's sentencing range by two points for his role as a leader/organizer. For sentencing purposes, the district court found the quantity of cocaine involved to be between two and 3.5 kilograms. Brown received a concurrent 130 month sentence for each count of conviction and an eight year term of supervised release. Cage was sentenced to 360 months in prison to be followed by eight years of supervised release, as well as a $5,000 fine.

## II. *Analysis*

A. Sufficiency of the Evidence

4

Brown and Cage both claim that the evidence adduced at trial was insufficient to support their convictions. In reviewing challenges to the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the jury's verdict, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2] In doing so, we resolve all credibility determinations and reasonable inferences in favor of the jury's verdict.[3]

Brown first claims that the government failed to adduce sufficient evidence at trial to prove that he individually possessed cocaine with the intent to distribute it in violation of 21 U.S.C. § 841. "To prove possession of a controlled substance with intent to distribute, the government must prove beyond a reasonable doubt the defendant's possession of the illegal substance, knowledge, and intent to distribute. The necessary knowledge and intent can be proved by circumstantial evidence."[4] Brown claims only that the government failed to prove the element of intent.

Brown's conviction for possession with the intent to distribute relates to his attempt to sell two ounces of cocaine to

---

[2] Jackson v. Virginia, 443 U.S. 307, 319 (1979).

[3] See United States v. Harvard, 103 F.2d 412, 421 (5th Cir. 1997).

[4] United States v. Payne, 99 F.3d 1273, 1279 (5th Cir. 1996) (quoting United States v. Rodriguez, 993 F.2d 1170, 1175 (5th Cir. 1993)).

5

an undercover agent in the Burger King parking lot. The officer who had arranged to meet Brown in the parking lot to purchase cocaine from him testified that as Brown approached his vehicle, the officer got out, identified himself, and told Brown that he was under arrest. Brown fled and, during the ensuing chase, tossed aside a bag which was later recovered by the police and determined to contain two ounces of cocaine. Brown argues that this evidence did not sufficiently establish that he intended to sell drugs to the officer because it did not show that (1) Brown offered to sell or deliver drugs to the officer, (2) Brown knew why the officer was in the Burger King parking lot, and (3) the cocaine Brown allegedly threw to the ground during the chase was for sale and not for his personal use. We disagree. A jury could reasonably conclude that Brown was in the Burger King parking lot and approached the officer's car with the intent to sell him cocaine as planned; in fact, that is the most likely construction of the evidence.

Brown also argues that even if the evidence is sufficient to allow a jury to infer that he possessed cocaine with the intent to distribute it, there is insufficient evidence to show that he was a member of a conspiracy to do so. "To establish a drug conspiracy [pursuant to 21 U.S.C. § 846], the government must prove: (1) the existence of an agreement between two or more persons to violate federal narcotics laws; (2) that the defendant knew of the agreement; and, (3) that the defendant voluntarily participated in

6

the agreement."[5]  "To establish such an agreement, the government has the burden to prove beyond a reasonable doubt that [the defendant] had 'the deliberate, knowing, specific intent to join the conspiracy.'"[6]  "The Government is not required to prove the existence of the conspiracy and the agreement between the co-conspirators and the defendant by direct evidence, but may present circumstantial evidence, such as the co-conspirator's concerted actions, from which the jury can infer that a conspiracy existed."[7]  However, "[i]t is not enough for it merely to establish a climate of activity that reeks of something foul."[8]

Considering the evidence adduced at trial in the light most favorable to the jury's verdict, as we must, we find it to be more than sufficient to support that verdict.  The jury heard testimony identifying Brown as one of the two voices on the wiretap conversations — conversations that can reasonably be construed as showing that Brown conspired with Cage to sell cocaine.

We find meritless Brown's contention that the government adduced insufficient evidence to prove that his was one of the two voices on the wiretap conversations because, according to Brown,

---

[5] United States v. Gallo, 927 F.2d 815, 820 (5th Cir. 1991).

[6] United States v. Galvan, 693 F.2d 417, 419 (5th Cir. 1982) (quoting United States v. DeSimone, 660 F.2d 532, 537 (5th Cir.1981)).

[7] Gallo, 927 F.2d at 820.

[8] United States v. Wieschenberg, 604 F.2d 326, 331-32 (5th Cir. 1979).

7

the identifying agent was not sufficiently familiar with Brown's voice and had no special expertise or training in voice identification. A witness need not possess such expertise or training to identify a recorded voice as long as the witness is well familiar with the voice he is identifying.[9] Here, the identifying agent had been in Brown's presence two or three times totaling several hours, giving sufficient familiarity.

Viewing the wiretap conversations in the light most favorable to the jury's verdict, they clearly establish Brown's role in the drug conspiracy. The recordings show that Brown repeatedly engaged in conversations with his alleged source of supply, Cage, regarding debts and dropping off checks. Surveillance performed in conjunction with the wiretap verified that money was placed in Cage's mailbox in a manner and in amounts consistent with the drop-offs discussed between Brown and Cage. For instance, during the recorded conversations between those two, a number of references were made to drops at the Georgetown apartments in New Orleans. On the date of Cage's arrest, a search executed pursuant to a search warrant produced $1,150 found in the mailbox;[10] prior to that date, Cage had told Brown that he owed him $1,200. Earlier, Cage and

---

[9] See United States v. Biggins, 551 F.2d 64, 68 (5th Cir. 1977) (pursuant to Fed R. Evid. 901(b)(5), a witness's familiarity with the voice sought to be identified is sufficient to ensure reliable voice identification).

[10] During that same search, packaging materials were found in Cage's apartment with a cocaine residue.

Brown discussed the number "9" during a recorded conversation and, subsequently, a search incident to a traffic stop of Cage produced $900 in cash. Viewed in combination with the other evidence presented at trial, the jury could reasonably conclude that these recorded discussions contained coded references to drug transactions. The jury's verdict is bolstered by Easterling's testimony that the quality of cocaine was tested for him by Brown at Cage's request and direction.

Finally, Brown argues that the jury had no basis from which to conclude that he should be held liable for the full extent of the conspiracy because he was unaware of many of its details, notably, Cage's trip to Houston to pick up approximately two kilograms of cocaine. Brown's ignorance of Cage's trip to Houston or any other specific details of the conspiracy is irrelevant. "The government does not have to prove that the defendant knew all of the details of the unlawful enterprise . . . as long as there is evidence from which the jury could reasonably infer that the defendant knowingly participated in some manner in the overall objective of the conspiracy."[11] Clearly, the government presented sufficient evidence to that effect at trial.

B. Admission of the Wiretap Evidence

Defendants advance two reasons why the district court erred in

---

[11] United States v. Posada-Rios, 158 F.3d 832, 858 (5th Cir. 1998).

denying their motion to suppress the wiretap evidence. They first contend that the affidavits presented in support of the wiretap failed to satisfy the "necessity" requirement of 18 U.S.C. § 2518(1)(c). We review for clear error a district court's decision regarding a motion to suppress recorded conversations on the ground of alleged deficiencies in affidavits offered to support authorization of a wiretap.[12]

18 U.S.C. § 2518(1)(c) requires that wiretaps be allowed only when the supporting affidavits provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[13] To satisfy this requirement, the applicant must demonstrate that normal investigative techniques, employing a normal quantity of resources, have not made a case for prosecution within a reasonable period of time.[14] We make that determination on a flexible, case-by-case basis: "What the provision envisions is that the showing be tested in a practical and commonsense fashion."[15]

Here, the applications asserted that "[n]ormal investigative techniques have been tried, have not been successful, and appear

_____

[12] United States v. Tomblin, 46 F.3d 1369, 1376 (5th Cir. 1995).

[13] 18 U.S.C. § 2518(1)(c) (2001).

[14] United States v. Krout, 66 F.3d 1420 (5th Cir. 1995).

[15] United States v. Hyde, 574 F.2d 856, 867 (5th Cir. 1978).

reasonably unlikely to succeed under the circumstances of this investigation." The supporting affidavits of the applying officers asserted that "[e]mployment of normal investigative techniques, i.e. normal surveillance, confidential informants, has not resulted in the direct evidence to determine the inner operations of this operation" and that a wiretap was the only remaining alternative not yet employed. The affidavits stated that "[n]ormal investigative techniques have not resulted in the arrest of individuals within this organization who are willing to testify against the remaining members of the organization," that confidential informants were unwilling to testify, and that interviews with those informants would be unsuccessful because the "persons knowledgeable about narcotic transactions or the contents of conversations regarding illicit transactions are the parties who are direct participants and targets of this investigation."

The agents further explained in their affidavits that not only were confidential informants unwilling to testify but their information had proven to be unreliable, and, moreover, such testimony, without corroboration by evidence gathered by wiretap, would be insufficient for a successful prosecution. They also stated that it would be impossible for an undercover agent to infiltrate the organization because Cage was wary of meeting new persons and there was "no informant in a position to introduce an undercover agent to the members of the organization."

These statements do not merely reflect in conclusory fashion

11

that a wiretap was necessary here, as Defendants contend, but instead explain precisely which techniques had been unsuccessful and why. In United States v. Krout, we upheld a wiretap authorization order on facts similar to those present here. Notably, we stated that:

> The affidavits contained detailed accounts of the investigative techniques . . .. Specifically, the affidavits asserted that informants or undercover agents could not infiltrate the conspiracy at high enough levels to obtain sufficient evidence to prosecute managers of the organization. This court has previously affirmed wiretap orders based upon similar affidavits.[16] These affidavits amply established an inability to fully develop a case from informants' knowledge, inability to infiltrate with undercover agents, lack of access to primary targets, the limited value of searches in proving these offenses, and informants' fear and unwillingness to testify.[17]

The instant facts fall well within the boundaries established in Krout. We conclude therefore that the district court did not clearly err in denying Defendants' motion to suppress the wiretap evidence on this ground.

Defendants also contend that the wiretap order violated Louisiana law, rendered applicable by 18 U.S.C. § 2516(2). It specifies that when a wiretap order is sought in state court, as is the case here, the state judge may authorize a wiretap "in conformity with section 2518 of this chapter and with the

---

[16] Krout, 66 F.3d at 1425 (citing United States v. Guerra-Marez, 928 F.2d 665, 671 (5th Cir. 1991); United States v. Webster, 734 F.2d 1048, 1055 (5th Cir. 1984)).

[17] Krout, 66 F.3d at 1425

12

applicable state statute."[18]  Defendants contend that the wiretap

was authorized in violation of Louisiana law because there is no

evidence that the authorizing judge examined the confidential

informants, as required by La. R.S. 15:1310(A)(3).  Because

Defendants did not raise this issue before the district court,

merely challenging the admission of the wiretap evidence generally

and on other grounds, we review this claim for plain error.[19]  Under

that standard, we may reverse a district court's decision only if

we conclude that (1) the district court committed an error, (2)

that was clear and obvious, and (3) that affected a defendant's

substantial rights.[20]  Only if these elements are satisfied may we

exercise our discretion to correct the error, and then only if it

"'seriously affect[s] the fairness, integrity, or public reputation

of judicial proceedings.'"[21]

"Error is defined as a deviation from a legal rule in the

absence of a valid waiver."[22]  We cannot credit the government's

argument that Defendants' failure to raise this issue before the

---

[18] United States v. Nelligan, 573 F.2d 251, 254 (5th Cir. 1978) (holding  that 28 U.S.C. § 2516 explicitly "provides for state court authorizations of interceptions [to be conducted] in conformity with the applicable state statute").

[19] United States v. Calverley, 37 F.3d 160, 163 (5th Cir. 1994) (en banc); United States v. Buchanon, 72 F.3d 1217 (6th Cir. 1995).

[20] United States v. Dupre, 117 F.3d 810, 817 (5th Cir. 1997).

[21] Calverley, 37 F.3d at 164 (quoting United States v. Olano, 507 U.S. 725, 732 (1993)).

[22] Calverley, 37 F.3d at 162.

13

district court constitutes <u>waiver</u> of the district court's error; instead, we perceive this to be an instance of <u>forfeiture</u>. "Waiver, the intentional relinquishment or abandonment of a known right is distinguishable from forfeiture, the failure to make the timely assertion of a right. Whereas the former results in no error, the latter does not extinguish the error . . . [and] may be reviewable [under the plain error standard] if it qualifies."[23] Clearly, this is an instance when Defendants did not knowingly relinquish their claim but merely failed timely to register their objection.

Under these conditions we must first ask whether the district court's denial of Defendants' motion to suppress the wiretap evidence was error at all. The Louisiana Supreme Court has interpreted La. R.S. 15:1310(A)(3) as requiring that information garnered via the wiretap authorization be suppressed only when (1) the authorizing judge fails to examine the confidential informants <u>and</u> (2) the confidential informants' information is essential to the requisite probable cause finding.[24] Our examination of the record indicates that it is likely that both prongs are satisfied here: Not only did the state judge fail to examine the confidential informants but it appears that their information was essential to

---

[23] <u>Calverley</u>, 37 F.3d 162 (internal quotations and citations omitted).

[24] <u>State v. Neisler</u>, 98-1384 (La. 1/16/96) 666 So.2d 1064, 1068-69.

the finding of probable cause on which the wiretap authorization was based. We therefore assume that the district court's failure to suppress the wiretap evidence was error.

Our next plain error inquiry is whether this error was "plain," that is, whether the error was "'obvious,' 'clear,' or 'readily apparent.'"[25] Put another way, plain errors "are errors which [sic] are so conspicuous that 'the trial judge and prosecutor were derelict in countenancing [them], even absent the defendant's timely assistance in detecting [them].'"[26] Defendants have failed to establish that the instant error satisfies this standard. The error complained of was essentially a violation of state law, made applicable by the relevant federal wiretap statute. The error was not apparent on the face of the wiretap authorization which, to the contrary, was supported by probable cause and valid under all federal law excepting the provision that makes the Louisiana statute applicable. It would be unreasonable to expect a federal district court (or even a federal prosecutor) to be sufficiently aware of Louisiana state law to notice this defect on its own. This is especially true given that Defendants, represented by Louisiana counsel, not only failed to raise this claim before the district court but argued strenuously for suppression of the wiretap evidence solely on the ground that the federal "necessity"

---

[25] Calverley, 37 F.3d at 163 (internal citations omitted).

[26] Id. (quoting United States v. Frady, 456 U.S. 152, 163 (1982)).

15

requirement had not been met.  This technical, state-law defect in the wiretap evidence was anything but "obvious" or "readily apparent."[27]


## C. Sentencing

Defendants raise several challenges, both individual and common, to the district court's sentencing determinations.  We examine "the district court's interpretation or application of the sentencing guidelines de novo and its findings [of fact] . . . for clear error."[28]  For sentencing purposes, the district court need only determine its factual findings "by a preponderance of the relevant and sufficiently reliable evidence."[29]

## 1. Quantity of cocaine involved

Defendants, for different reasons, contest the district court's finding that the quantity of drugs attributable to them for sentencing purposes is between two and 3.5 kilograms.  United States Sentencing Guidelines ("USSG") § 1B1.3(a)(1)-(2) provides that a defendant's sentence is to be determined on the basis of all

---

[27] We note that even if we were to conclude that the instant error was "plain" and, moreover, that it affected Defendants' substantial rights, we would decline to exercise our discretion to reverse the district court's refusal to suppress the wiretap evidence because this error is not one that calls into doubt the "'fairness, integrity, or public reputation of judicial proceedings.'" Calverley, 37 F.2d at 64 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)).

[28] United States v. Huerta, 182 F.3d 361, 364 (5th Cir. 1999).

[29] United States v. Huskey, 137 F.3d 283, 291 (5th Cir. 1998).

criminal acts he participated in during the offense of conviction as well as all criminal acts that were part of the same course of conduct as the offense of conviction. Defendants were convicted of individually possessing with the intent to distribute and conspiracy to possess with the intent to distribute cocaine over an extended period of time, encompassing several distinct transactions. The district court made its determinations of drug quantity by adopting the presentencing report ("PSR"), finding that the PSR was well-supported by the evidence adduced at trial.

The PSR stated that it was accurate to hold Cage responsible for between two and 3.5 kilograms by adding (1) the two kilograms he was found with on his return trip from Houston, (2) "the ½ kilogram that he obtained from an unindicted coconspirator and [(3)] the fourteen ounces [392 grams] that he sold to Calvin Brown during the course of the conspiracy." Cage objects to this finding, contending that the district court clearly erred in finding that the packages found in his possession when he was stopped on his return from Houston contained two kilograms of cocaine. He argues that the district court had no basis for that finding because only one of the packages was tested for cocaine and that neither was weighed. Therefore, he contends, the record at best supports an inference that the packages amounted to approximately 1½ kilograms because that was the amount Easterling, the apparent prospective purchaser of these packages of cocaine, testified that he was buying.

17

We note first that the district court was well within its discretion in crediting the testimony of the forensic chemist from the Louisiana Police Crime Lab that both packages had been tested (positively) for cocaine. Cage correctly points out, however, that there is no proof in the record that the packages were ever weighed. Although Cage argues on appeal that he properly objected to the district court's adoption of the PSR's finding of the weight of those packages,[30] our conclusion need not turn on the efficacy of Cage's purported objection: His claim fails on the merits as well. The record contains sufficient evidence to support a conclusion by the district court that the packages contained at least 1.5 kilograms, as Cage concedes. In conjunction with the court's other undisputed findings, the record clearly contains sufficient evidence to support the finding that Cage should be held responsible for more than two kilograms of cocaine.

---

[30] Cage did argue before the district court, during sentencing, that the government had not presented evidence that the packages in question had been weighed. However, he did not do so in the context of objecting to the PSR's finding regarding the quantity of drugs but rather in the course of arguing for a sentencing reduction for an acceptance of responsibility. Specifically, he argued that he was willing to enter into a plea bargain for the quantity of drugs that he was charged with and ultimately convicted for being responsible for — between two and 3.5 kilograms — but was unwilling to accept the government's plea offer because it required him to accept responsibility for five kilograms of cocaine. In the course of his explanation of why accepting responsibility for that larger amount was unacceptable to him, he mentioned in passing that even though the government had not shown at trial that he should be responsible for even two kilograms, he had been willing to acknowledge responsibility for two to 3.5 kilograms, implying the accuracy of that range.

The district court found that Cage was responsible for at least 0.9 kilograms of additional cocaine. This finding was adopted by the district from the PSR, specifically its statement that Cage had obtained one-half a kilogram from an unindicted coconspirator and had sold at least 14 ounces (392 grams) to Brown. "The PSR generally bears sufficient indicia of reliability to be considered as evidence by the district court in resolving disputed facts. A district court may thus adopt facts contained in the PSR without further inquiry if the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence."[31] Because Cage presents no such rebuttal evidence regarding the attribution of the one-half kilogram that he is said to have obtained from the unindicted coconspirator or the 392 grams that he allegedly sold to Brown, the district court was free to adopt the PSR's finding.

Accordingly, we find that the district court did not clearly err in adopting the PSR's findings that Cage was responsible for more than two kilograms of cocaine. In combination with the finding that Cage possessed approximately 1.5 kilograms when his vehicle was stopped, the finding that he was responsible for an additional 0.9 kilograms clearly supports the district court's determination that Cage was responsible for more than two kilograms of cocaine.

---

[31] United States v. Brown, 54 F.3d 234, 241 (5th Cir. 1995) (citations omitted).

19

As for Brown, he too contests the district court's attribution to him of more than two kilograms of cocaine. The court predicated its findings on the PSR's conclusion that Brown should be found responsible for at least two kilograms of cocaine, based on (1) the approximately 1.5 kilograms[32] that Cage obtained in Houston and was arrested with, (2) the 14 ounces (392 grams) that Brown purchased from Cage during the conspiracy, and (3) the two ounces (56 grams) discarded by Brown while he was being chased immediately prior to his arrest.

For sentencing purposes, a defendant convicted of being part of a drug conspiracy is responsible not only "for the drugs with which [he] was directly involved but also those that can be attributable to him as part of his 'relevant conduct' under § 1B1.3 of the Sentencing Guidelines."[33] "Relevant conduct" includes "reasonably foreseen acts and omissions of others in furtherance of the jointly undertaken criminal activity."[34]

Brown first argues that the district court committed clear

_____

[32] Brown does not challenge the weight of the packages of cocaine that Cage was found to have in his possession. As we discussed regarding the quantity of drugs for which Cage was held responsible, for sentencing purposes, the district court found that those packages contained two kilograms of cocaine. Because the issue is slightly in doubt but is ultimately immaterial to our inquiry, however, we will assume that the packages of cocaine weighed only 1.5 kilograms of cocaine, the amount that Cage concedes they contained.

[33] United States v. Gallardo-Trapero, 185 F.3d 307, 325 (5th Cir. 1999).

[34] USSG § 1B1.3.

error in finding that it was foreseeable to him that Cage would obtain 1.6 kilograms of cocaine from his source in Houston. Brown points out that (1) the agent who testified regarding the meaning of the wiretap conversations stated that he did not think Brown knew that Cage was going to Houston to obtain cocaine from his supplier, and (2) the wiretap evidence produced by the government did not show that Brown knew Cage was going to Houston to obtain cocaine. This argument misapprehends the applicable law. Although it is unlikely that Brown knew all the details of Cage's plans or the quantities of cocaine Cage intended to procure from his sources, the district court was only required to find that Brown was aware that Cage undertook other actions in furtherance of the conspiracy, especially plans and actions to obtain cocaine from his sources. Such a finding is well supported by the evidence.

Brown next challenges the sentencing court's finding that he had purchased 14 ounces of cocaine from Cage, a finding based on police analysis of the wiretap conversations. Again, we disagree. The district court was free to infer, as did the jury, that the numbers discussed during the recorded conversations referred to money and drugs. Moreover, Brown's contentions to the contrary notwithstanding, the wiretap evidence reasonably supports the PSR's conclusion that Brown purchased at least 14 ounces of cocaine from Cage because the district court was free to credit the agent's testimony to that effect, including his interpretation of the "coded" recorded conversation. As with Cage, in combination these

separate findings support the district court's determination that Brown was responsible for more than two kilograms of cocaine.

The district court's finding of drug quantities for which Defendants should be held responsible is reasonably supported by the record evidence or, in some instances, by unchallenged statements of the PSR. We are satisfied not only that the district court did not commit clear error in attributing between two and 3.5 kilograms of cocaine to both Brown and Cage, but that the court affirmatively reached the correct results.

2. Defendants' Apprendi Claims

We review "the defendants' challenges to their sentences for plain error in light of their failure to raise the objections below."[35]

Defendants argue that, in two respects the district court's determination of the quantity of cocaine involved without submitting the issue to the jury, resulted in their being sentenced in violation of their constitutional rights as clarified by the Supreme Court in Apprendi v. New Jersey.[36] They first challenge their respective terms of imprisonment, although in doing so, they

---

[35] United States v. Meshack, 225 F.3d 556, 575 (5th Cir. 2000), cert. denied, 121 S.Ct. 834 (2001), petition for reh'g, 244 F.3d 367 (citing Johnson v. United States, 520 U.S. 461, 467 (1997) (reviewing for plain error even though the case on which the defendants relied had not been decided at the time of trial)).

[36] 530 U.S. 466 (2000).

expressly concede that this argument is barred by our recent precedent applying <u>Apprendi</u> to similar cases.[37] As we are bound by this precedent, we are precluded from considering these claims.

We do, however, find merit in Brown's claim that the district court committed plain error by sentencing him to eight years of supervised release as specified in 21 U.S.C. § 841(b)(1)(B) (the penalty provision corresponding to § 841(a)(1) requiring a showing that the defendant's drug offense involved between at least 500 grams of cocaine). Because <u>Apprendi</u> requires that Brown be sentenced under § 841(b)(1)(C) (the penalty provision corresponding to § 841(a)(1) which does not require the showing of a quantity of drugs) and that provision, as interpreted by our decision in <u>United States v. Meshack</u>,[38] allows a maximum of six years' supervised release irrespective of drug amount — in light of the fact that he was convicted of a prior offense[39] — Brown's eight-year term of supervised release cannot stand. Therefore, because Brown was

---

[37] <u>See, e.g.</u>, <u>United States v. Doggett</u>, 230 F.3d 160 (5th Cir. 2000); <u>United States v. Keith</u>, 230 F.3d 784 (5th Cir. 2000).

[38] 225 F.3d 556 (5th Cir. 2000).

[39] <u>Meshack</u>, 225 F.3d at 578. There, we reconciled the apparent discrepancy between the requirement of 21 U.S.C. § 841(b)(1)(C) that the period of supervised release be "<u>at least</u> 6 years" (emphasis added) and the requirement of the applicable sentencing guideline, 18 U.S.C. § 3583(b)(2), that the period of supervised release be "<u>no more than</u> five years" (emphasis added) permitting a defendant convicted pursuant to § 841(b)(1)(C) to be sentenced to no more than six years of supervised release. 225 F.3d at 578 (citing <u>United States v. Kelly</u>, 974 F.2d 22, 24-25 (5th Cir. 1992)).

23

sentenced to an eight-year term of supervised release, the district court plainly erred.[40]

Although Cage did not expressly raise a similar objection, he did voice a general challenge that his term of imprisonment violated Apprendi. It is at least arguable that this challenge should be construed as encompassing any and all Apprendi errors committed by the district court in the course of sentencing Cage. Moreover, even if the manner in which Cage presented this challenge was too general to have raised the specific issue of Apprendi's effect on his term of supervised release, "we have discretion to suspend the Federal Rules of Appellate Procedure 'for good cause shown.'"[41] On those occasions in which we are concerned that it would be "anomalous" to correct an error preserved as to only one defendant "when all defendants suffer from the same error, we consider the argument[] to be adopted [by all]. This adoption does not prejudice the government which had the opportunity to fully brief all issues in response to the various contentions of the defendants."[42] We find this to be an appropriate instance in which to exercise that discretion.

As with Brown, Apprendi requires us to consider Cage's conviction as occurring pursuant to § 841(b)(1)(C) which, under our

---

[40] Meshack, 225 F.3d at 578.

[41] United Sates v. Gray, 626 F.2d 494, 497 (5th Cir. 1980).

[42] Id. (citations omitted).

interpretation of <u>Apprendi</u> in <u>United States v. Meshack</u>,[43] here allows for a maximum period of supervised release of six years. We are therefore constrained to conclude, as we did with Brown, that the district court plainly erred in sentencing Cage to eight years of supervised release. We thus vacate the terms of supervised release of both Defendants and remand to the district court so that it may modify this aspect of their sentences in accordance with our decisions in <u>Meshack</u> and <u>United States v. Kelly</u>,[44] to fall somewhere from the minimum term of five years specified in 18 U.S.C. § 3583(b)(2) (the applicable sentencing guideline provisions for class B felonies, the offense class under which a violation of § 841(b)(1)(C) falls) to the maximum of six years specified in § 841(b)(1)(C).

3. Cage's Role as a Leader/Organizer

Cage asserts that the district court erred in assessing him a two level increase for his role as a leader/organizer pursuant to USSG § 3B1.1. He essentially argues that the record evidence, which he insists demonstrates only that he purchased and re-sold cocaine, is insufficient to support the district court's determination that he was a leader/organizer and the resulting imposition of a two level increase of his offense level. Such an

---

[43] 225 F.3d 556 (5th Cir. 2000).

[44] 974 F.2d 22 (5th Cir. 1992).

adjustment "is proper only if [Cage] was 'the organizer or leader of at least one other participant in the crime and if he asserted control or influence over at least that one participant.'"[45] We have previously observed that

> [t]he commentary to sentencing guideline section 3B1.1 suggests that the court consider the following factors in making the organizer, leader, manager, supervisor determination: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others.[46]

With these factors in mind, we conclude that the district court did not clearly err in determining that the evidence adduced at trial demonstrated that Cage was a leader/organizer within the meaning of USSG § 3B1.1. The wiretap recordings show that Brown reported his progress to Cage on a number of occasions and that Cage instructed Brown as to amounts owed and the actions he was to take in furtherance of the drug conspiracy. Moreover, when Brown confirmed to Cage and Easterling the poor quality of some cocaine, he did so at Cage's direction. The district court was on firm ground in its assessment of Cage's role in the conspiracy.

---

[45] United States v. Perkins, 105 F.3d 976, 980 (5th Cir. 1997) (quoting United States v. Jobe, 101 F.3d 1046, 1065 (5th Cir. 1996)).

[46] United States v. Barretto, 871 F.2d 511, 512 (5th Cir. 1989) (quoting Application Note 3, S 3B1.1).

26

C.  Cage's Ineffective Assistance of Counsel Claim

Cage contends, for the first time on appeal, that he was prejudiced by the ineffective assistance provided by his counsel, in violation of his Sixth Amendment rights.[47]  "The general rule in this circuit is that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations."[48]  We have "undertaken to resolve claims of inadequate representation on direct appeal only in rare cases where the record allowed us to evaluate fairly the merits of the claim."[49]  Because Cage did not raise this issue before the district court and the record is not sufficiently developed to allow us to review his claim, we decline to do so.  We therefore dismiss his claim without prejudice to his right to raise the issue in an application for collateral relief under 28 U.S.C. § 2255.[50]


III. *Conclusion*

---

[47] See Strickland v. Washington, 466 U.S. 668 (1984).

[48] United States v. Higdon, 832 F.2d 312, 313-14 (5th Cir. 1987); see also United States v. Glinsey, 209 F.3d 286, 392 (5th Cir. 2000).

[49] Higdon, 832 F.2d at 314.

[50] Id. at 314 (citing United States v. McClure, 786 F.2d 1286, 1291 (5th Cir. 1986); United States v. Rodriguez, 582 1015, 1016 (5th Cir. 1978)).

Defendants challenge their drug convictions on numerous grounds. We hold these challenges to be without merit, concluding that there is sufficient evidence to support Defendants' convictions. We also hold that the district court did not clearly err in (1) refusing to suppress the wiretap evidence, (2) determining the quantity of drugs for which each defendant was responsible, and (3) assessing Cage a two level increase for his role as a leader/organizer. We do find merit, however, in Defendants' claims that they were sentenced in violation of their constitutional rights as clarified in Apprendi, but only as far as supervised release is concerned. We therefore vacate the supervised release portion of the sentences and remand to the district court to modify Defendants' sentences accordingly. Finally, we agree with the government that it would be inappropriate for us to review Cage's ineffective assistance of counsel claim at this juncture, so we dismiss that claim without prejudice. In sum, we affirm Defendants' convictions, and we affirm their sentences in all respects other than their terms of supervised release, which we vacate and remand to the district court for modification consistent with this opinion and for resentencing to supervised release as thus modified.

AFFIRMED in part; VACATED and REMANDED in part.